HENRY A. SCHLENCKER, PLAINTIFF IN ERROR, V. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. **Homicide:** MALICE. It being shown that the prisoner voluntarily, and without just cause or provocation, shot and killed the deceased, the act being unlawful, malice will be presumed.

2. ————: MURDER IN THE FIRST DEGREE. And in addition to being unlawful and malicious, to make the act of killing murder in the first-degree, it is only necessary to establish that it was done with deliberation and premeditation, of which there being some evidence before the jury, their verdict fixing that as the degree of criminality is conclusive on that point.

3. **Questions of Fact to be Settled by the Jury.** In criminal cases all questions of fact are to be settled by the jury, and unless the want of sufficient evidence to support their finding be very clear, it will not be disturbed.

4. **Re-examination of Witnesses.** As a general rule the re-examination of a witness should be limited to the points arising out of the cross-examination. But whether this rule shall be strictly enforced or not seems to rest entirely in the discretion of the presiding judge.

5. **Witness:** EXPERT: SUPPOSED CASE. In the examination of an expert witness as to the appearance of the bullet wound of which the deceased died, it is not improper to state a supposed case as a means of showing what, under different. conditions, the appearance of a wound made by the same agency might or would have been.

18

Schlencker v. The State.

6. **Practice:** QUESTIONS CONSIDERED BY THE SUPREME COURT. In the supreme court the examination of questions relating to the evidence is confined to such as were distinctly raised and passed upon in the court whose record is under review.

7. **Non-expert Witness:** OPINION OF. The opinion of a witness, not an expert, is competent evidence upon the question of the prisoner's sanity, where such opinion is formed upon facts within the personal knowledge of the witness, and sworn to by him before the jury.

8. **Intoxication no Excuse for Crime.** Voluntary intoxication is no excuse for crime; but on the trial of one charged with murder in the *first* degree, his intoxication may be taken by the jury *as a* circumstance *to* show that the act of killing was not deliberate and premeditated.

9. **Insanity:** WHEN IT DOES NOT EXCUSE CRIME. Temporary insanity produced immediately by intoxication does not destroy responsibility where the accused, when sane and responsible, made himself voluntarily drunk.

ERROR to the district court of Lancaster county.

The plaintiff in error was indicted at the October Term, 1878, for the murder of Florence Booth, on the 10th day of October. The testimony showed that on that day, Schlencker, while under the influence of liquor, obtained a revolver at a gunsmith's, between twelve o'clock noon and one in the afternoon; went to a house generally known as the "Stone House," kept by one Mollie Hall, between three and four o'clock; was in one of the rooms with Florence Booth and some others for a few minutes, then going up-stairs, preceded by Florence, went into a room at the head of the stairs; requested Florence to lay down with him, which she refused, and "told him to lay down and take a sleep;" he said "something," and she called him "a Dutch son-of-a-bitch;" a shot was then heard, and Florence came down the stairs, saying, "Harry has killed me, he has shot me through the heart;" Schlencker was

heard to say, "My name is Henry Schlencker, I have shot my woman and I will shoot myself;" a shot was heard and then another; Florence died in about three-quarters of an hour after being shot; Schlencker was found on the bed up-stairs, having shot himself. He recovered from the wound, and having been placed on trial before POUND, J., and a jury, was found guilty of murder in the first degree and sentenced to be hung on the 7th day of March, 1879. He sued out this writ of error and obtained a suspension of the sentence. The judgment having been affirmed here, a warrant was issued directing the sheriff to carry the sentence into effect on the 13th day of June, 1879. Having obtained a reprieve from the governor, he applied to this court for a re-hearing, which was granted, the warrant recalled, and further proceedings stayed until the determination of the case on the re-hearing, *post*.

On the trial below several witnesses for the defense testified that on the day of the murder, and for some time previous, the prisoner had acted " strangely ;" that he had "no work," " was drinking," "had nothing to eat," "was not in his right mind," "was excited, walked hastily," " acted queer," " tried to run against us," "acted funnier than he ever did before," " looked kind of fierce," " had fits," " was drinking day of tragedy," " looked as if he was dreaming, as if there was something on his mind," etc.

M. C. Keith for the defense also testified that he was " a physician, studied in Dublin, London, Paris, Cincinnati, and in Maine; am in active practice now; examined Schlencker's wound; it was in the left breast above the nipple; probed it to the depth of four to five inches; blood was thin, red, arterial; felt of the corpuscles of the blood; they were in an alcoholic condition; smelt of them; put my nose down, and smelt the blood that was coming.

Schlencker v. The State.

Q. What would produce such a condition of the blood?

A. Alcohol, or anything containing alcohol.

Q. What use of alcohol would be required to produce that condition of the blood corpuscles?

A. Constant and continued use from three to six months or longer.

Q. Can the condition of a man's brain be told from the condition of the blood.

A. It can to a partial extent.

Q. To what extent, can you tell?

A. Whether a man can be sound mentality from the condition of the blood.

Q. What effect has alcohol on the brain?

A. It first irritates, then deranges, and then disintegrates.

Q. What effect has the constant use of the alcoholic poison four to six months on the blood and constitution of the brain?

A. Constant use would have the effect of causing the disease called dipsomania or oinomania, in which the brain would become diseased—disintegrated—in which the blood would become so deteriorated and the brain so irritated, the man would really have no power over himself, and would be possessed by some single mania. The constitution of the brain might be so deteriorated that the man would be possessed of only one idea. There are three stages of dipsomania—acute, periodic, and chronic.

Q. You may state if the prisoner here was diseased with that disease?

A. I should say he was.

Q. In what degree?

A. I should think chronic.

Q. What effect would it have upon the mentality of a person afflicted with chronic oinomania?

A. He has not more than one single idea, and the mania is almost always homicidal or destructive. His desire is to destroy something—hurt his best friends —he goes for his best friends, those he is fondest of— falls out with his own wife and children. Under that influence he will sell the last thing he has to get liquor; at the time of the frenzy kill his son, or daughter, or wife, or best friend.

Q. You think these acts are the effects and symptoms of the disease?

A. I think so.

Q. Can you tell this by looking at the blood?

A. I can tell a good deal by looking at the blood.

Q. What was the condition of the man on that occasion?

A. He looked as if he were in a stupor either from drink, or had passed through a paroxysm. There was a moist—profusely moist feeling in his hands. Eyes protuberant. Pulse about 76. * * * I should judge the man had just passed a paroxysm of madness.

Q. What was your opinion as to the condition of his his mind when he was going through that paroxysm —as to his sanity or insanity?

A. A person in having this paroxysm generally don't know anything. They don't realize their condition. Their desire is to destroy, and the idea is to get rid of that destructive force that is in them at the time.

Cross examination—

Q. Are you willing to swear if this man at that time was afflicted with the disease of dipsomania or oinomania?

A. I will not so swear. I swear I think he may have had. I should judge he had just passed through a paroxysm of madness, as it might be termed, caused by that disease.

Q. It was a paroxysm of madness from the excessive use of liquor?

A. That is it exactly.

In rebuttal the state called J. A. Carter, a physician, who testified:

Q. Take two teaspoonfuls of blood, and are you enabled to smell alcohol in that blood, where the persons from whom the blood came had been drinking alcohol?

A. I never tried the experiment at all:

Q. Are there any authorities at all which lay it down as a principle that that can be done?

A. In examining a case there is always a great deal of alcohol thrown off by the breath. If examined in the same room where the patient is, it would be a difficult matter to tell whether they were getting the effluvia from the breath or blood.

Q. Are you enabled by an examination of the blood by feeling and smell to ascertain to any extent the condition of the brain?

A. No sir. As I said before, my touch is not educated up to that point. Neither is my smell. There are no standard medical works that lay down that doctrine.

The state also called a number of witnesses who testified to having seen the prisoner at different periods before the homicide and on the same day. "He seemed perfectly sane," "he walked straight enough," "his face looked natural," "he appeared to be all right," "saw him on the witness stand about the last day of September; he was a little excited, but nothing peculiar in his action at all; should say he was sane from his general appearance," etc.

*James E. Philpott* and *D. G. Courtnay*, for plaintiff in error.

Schlencker v. The State.

1. It is proper that the jury should take drunkenness into consideration when considering motive and intent of the prisoner. *Caleb Nichols v. The State of Ohio*, 8 Ohio St., 435. *Roberts v. The People*, 19 Mich., 401. *Pirtle v. State*, 9 Hump., 663. *People v. Harris*, 29 Cal., 678. 1 Wharton & Stille's Medical Jur., sec. 215. The instruction given by the court at request of the counsel for the state, that "settled insanity produced immediately by intoxication, etc., but insanity immediately produced by intoxication does not destroy responsibility when the patient, when sane and responsible, made himself voluntarily intoxicated," is error. The instruction as given is not a fair statement of the law, and tended to mislead the jury. *State v. Hundley*, 46 Mo., 414. Medical Jurisprudence of Insanity, sec. 372.

2. The testimony of non-experts should have been excluded. 1 Phil. Ev., 290. 1 Stark Ev., 54, 153. 3 Stark Ev., 1707. *Real v. The People*, 42 N. Y., 270. *Clapp v. Fullerton*, 34 N. Y., 190. *O'Brien v. People*, 36 N. Y., 276. *Dewit v. Barley*, 9 N. Y., 371. *Phillips v. Kingfield*, 19 Maine, 375. *Paige v. Hazard*, 5 Hill, 603. *The People v. Reeld*, 19 Wend., 569. *Giles v. Toole*, 4 Barb., 261. *Smith v. Gugerty*, 4 Barb., 615. 7 Met., 504. 2 Ohio State, 452. 5 Pick., 510. 7 Wend., 72. 17 Wend., 136.

*C. J. Dilworth, Attorney General*, for the State.

The law upon intoxication and insanity was properly given to the jury by the instructions of the court, and the instructions were as favorable to the accused as the law would permit. *Rex v. Thomas*, 32 Eng. C. L., 889, 890. *Rex v. Meakin*, 32 Id., 622. *Com. v. Hawkins*, 3 Gray, 463, 466. *Nichols v. State*, 8 O. S., 435, 437–8. *People v. Rogers*, 18 N. Y., 9, 18. *Com.*

*v. Rogers*, 7 Met., 500, 501–506.    *State v. Spencer*, 1 Zab., 196, 200–202.    *Graham v. Com.*, 16 B. Mon., 587, 594.    *People v. Myers*, 20 Cal., 518, 520.    *The People v. Robinson*, 2 Parker's Crim. Rep., 235.    *Wright v. The People*, 4 Neb., 409.

There was no error in the court refusing to give the instructions asked for by the plaintiff in error, as the court had already fully and properly instructed the jury upon all the points raised by the instructions asked for by the plaintiff in error.    *Clough v. The State*, 7 Neb., 323.

LAKE, J.

From a careful reading of the evidence as embodied in the bill of exceptions, we have reached the conclusion that it is sufficient to support the verdict of the jury.

That the prisoner shot and killed the deceased without any just cause or provocation is placed beyond all question.    Therefore, if the act of shooting was voluntary, as it must be presumed in law to have been in the absence of proof to the contrary, it was, necessarily, *unlawful*.    And, under these circumstances, the act was also malicious, for the rule is that if a man kill another without considerable provocation the law implies malice, for no person, unless of an abandoned heart, would be guilty of such an act upon a slight or no apparent cause.    2 Broom & Hadley Com., 484 (Am. Ed.) And in addition to its being unlawful and malicious, to make the act of killing murder in the first degree, it is only necessary to establish that it was done with deliberation and premeditation, of which there was some evidence in the previous acts of the prisoner on the day of the homicide, among which is the important one of borrowing and arming himself with a revolver

from which he fired the fatal shot. As to the suffi-
ciency of the evidence on this, as well as all other
branches of the case, that is a matter wholly within
the province of the jury to settle. *Palmer v. The People*,
4 Neb., 68. This court has neither the right nor the
disposition to usurp the province of the jury, or to in-
terfere with their decisions of questions of fact, unless
the want of sufficient evidence to support the finding
is very clear. This is all that need be said on this
branch of the case, and we will now proceed to exam-
ine as to the alleged errors occurring in the admission
of testimony, and in the instructions to the jury.

The record shows that on the conclusion of the
cross-examination of Dr. Paine, a witness called on the
part of the state, he was re-examined by the district
attorney as to the extent of the wound upon the body
of the deceased, of which he had given a general de-
scription in his direct examination. The witness be-
ing asked to give the diameter of the wound as nearly
as he could, this was objected to on the ground that it
was not a proper re-examination of the witness, inas-
much as it did not relate to any matter called out on
the cross-examination. The general rule on this sub-
ject is, as claimed by counsel for the prisoner, that the
re-examination should be limited to the points arising
out of the cross-examination. But while this is the
rule usually observed by courts, it seems to rest "en-
tirely in the discretion of the judge whether it ought
to be strictly enforced or remitted as he may think
best for the discovery of truth, and the administration
of justice." 2 Phillips on Evidence, 912.

Dr. Gilbert, one of the witnesses for the prosecution,
in explaining to the jury the comparative size of a
bullet, said to have been taken from the body of the
deceased, and the wound of which she died, having
testified that "the wound looked smaller than the

ball," was asked by the district attorney to explain why this was so, and "whether that would have been the case had the ball gone through the body—on the other side, how would it have looked?" This was objected to by the prisoner's counsel "as immaterial and incompetent." The object of the question evidently was to have the jury understand that it was not at all remarkable or unusual that in this case the orifice appeared to be considerably smaller than the missile that they were asked to believe produced it. And this testimony was very proper, for it rested upon the prosecutor to convince the jury that the wound in question was made by the identical bullet then exhibited to them. Nor was it at all improper to state a supposed case, and thus show what, under different conditions, the appearance of a wound made by the same agency might or would have been. There is no just ground for complaint in this particular.

Again, it was contended in argument that the court erred in not restricting the cross-examination of the witness Kluetsch, by the district attorney, "to the facts and circumstances drawn out on his direct examination." While the rule governing the cross-examination of witnesses is as claimed by counsel for the prisoner, the record shows that its violation was not the ground of complaint in the court below. The only objections there made were that the testimony was "irrelevant and immaterial." The testimony referred to may have been open to the technical objection made here, but it most certainly was not to those brought to the attention of the trial court. This being a court for the correction of errors, our examination of questions relating to the evidence is confined to such as were distinctly raised and passed upon in the court whose record is under review.

The defense of insanity being interposed, and sev-

eral witnesses having testified of strange conduct on the part of the prisoner shortly before, and on the day of the homicide, a number of witnesses, not experts, however, were examined by the state as to his conduct and appearance in their presence on sundry occasions, both before and shortly after the shooting occurred. The opinions of these witnesses as to the prisoner's mental condition, based upon what they had personally observed, and then detailed to the jury, were admitted in evidence under the objection that they were incompetent evidence. That none but medical experts shall be permitted to give to the jury their opinions, based upon the testimony of other witnesses on the question of insanity, is, we believe, universally held. In this case, however, the witnesses were the neighbors and acquaintances of the prisoner, knew him well, and their opinions were formed from seeing and observing him for several months, almost daily. Opinions formed under these circumstances, although not those of medical men, are, nevertheless, entitled to respectful consideration by courts and juries, and we have seen no satisfactory reason for holding them to be incompetent evidence. We are aware that our conclusion on this point is in conflict with numerous authorities, but it is also sustained by many.

In *Grant v. Thompson*, 4 Conn., 203, Chief Justice Hosmer, in commenting on this sort of evidence, said : " The best testimony the nature of the case admits of ought to be adduced, and on the subject of insanity, in my judgment, it consists in the representation of facts and the impressions which they make." And what impressions are so reliable as those made upon the minds of intelligent persons, who, in addition to being well acquainted with the alleged lunatic,. have themselves witnessed the facts supposed to indicate mental derangement ? *Clark v. The State*, 12 Ohio,

483. *State v. Klinger*, 46 Mo., 224. *Titlow v. Titlow*, 54 Penna. St., 216.

And while on this branch of the case we desire to add that, although this defense of insanity was probably made in good faith, it does not seem to have anything substantial to rest upon. The evidence falls very far short of establishing its existence. That the prisoner was considerably intoxicated, and his mind somewhat clouded in consequence thereof, are doubtless true. But the fact that he was in a drunken state does not of itself render the act of shooting the deceased any the less criminal, nor is it available as an excuse. If, notwithstanding his intoxication, he were conscious that the act was wrong, he was a responsible agent, and answerable for all the consequences. In charging upon this point the judge told the jury, in substance, that they were at liberty to take the fact of intoxication as a circumstance to show that the act of killing was not deliberate and premeditated. This was right, and suggested to the jury the full extent of the effect that might legitimately be given to it. *People v. Rogers*, 18 N. Y., 9. *People v. Belencia*, 21 Cal., 544.

Several of the instructions given to the jury are also made the basis of alleged errors, but we fail to perceive any just ground for the complaint made in this particular. The instruction most complained of was given at the request of the district attorney, and was in these words: " That *settled* insanity produced by intoxication affects the responsibility in the same way as insanity produced by any other cause. But insanity immediately produced by intoxication does not destroy responsibility when the patient, when sane and responsible, made himself voluntarily intoxicated."

In the case of *State v. Hundley*, 46 Mo., 414, it appears that the court had instructed the jury " that if they be-

lieved from the evidence that the defendant was labor-
ing under a temporary frenzy or insanity at the time
of the killing of Boyer, which was the immediate re-
sult of intoxicating liquors, or narcotics, he was guilty."
And in commenting upon this instruction the court
said: " This instruction was unobjectionable, for, as we
have already seen, temporary insanity produced imme-
diately by intoxication does not destroy responsibility
where the accused, when sane and responsible, made
himself voluntarily drunk.   But the crime, to be pun-
ishable under such circumstances, must take place, and
be the immediate result of a fit of intoxication, and
while it lasts, and not the result of insanity remotely
occasioned by previous bad habits."

The only substantial difference between the law as
thus pronounced and the instruction complained of is
in the omission from the latter of the qualifying clause
limiting responsibility to cases of *temporary* insanity or
frenzy.   But while, under different circumstances, this
omission might have been a serious matter, it certainly
was of no consequence under the testimony in this
case.   There was not a syllable of evidence of the exist-
ence of settled insanity.   The utmost that was claimed,
or that there was the least testimony to establish, was
a mere temporary frenzy or condition of irresponsi-
bility on the part of the prisoner.   There is, therefore
in this matter, no ground for complaint.

Error is also alleged because of the refusal of the
court to give several instructions to the jury requested
on behalf of the prisoner.   By the first of these it was
sought to make his voluntary intoxication under cer-
tain circumstances a complete excuse for the homicide.
There was no error in this refusal, for the court, as we
have seen had already charged upon this point, and
laid down the law correctly, recognizing the "well
known and salutary maxim of our laws, that crimes

committed under the influence of intoxication do not excuse the perpetrator from punishment." Beck's Medical Jurisprudence, vol. 1, page 333. Several others so requested were upon the subject of insanity. These, however, were substantially embodied in those already given by the court of its own motion, and it was unnecessary to repeat them.

In conclusion we think the law of the case, so far as our attention has been called to it, was very fairly given to the jury, and that notwithstanding the errors assigned, and relied upon, the judgment should be affirmed.

JUDGMENT AFFIRMED.