ROBINSON *et al.*, v. PERU PLOW & WHEEL CO.

[*Opinion Filed January 6, 1893.*]

1.   TROVER— *Cause of Action*—A petition in trover states a cause of action
when it alleges that plaintiff was the owner of the property in ques-
tion, describing it, and alleging its value. and that defendants wrong-
fully took and converted it to their own use.

2.   PLEADING—*Title of Suit*—A suit was described in the petition as
brought "in the United ¬tates district court in and for the second
judicial district of the Territory of Oklahoma," but the summons de-
scribed the court as "the district court of the Territory of Oklahoma,
United States of America, for the fifth county thereof," and was
directed to the sheriff of that county, and served by him.   The cause
was treated as pending in the district court of the fifth county, and on
the territorial side of the court, which had jurisdiction of the subject
matter and of the parties, whereas the federal side of the court, which
was described in the petition, had no jurisdiction, either of the parties
or the subject-matter.   *Held*, that the words in the petition and other
parts of the record which incorrectly describe the court should be
rejected as surplusage  and the suit treated as brought on the territo-
rial, and not the federal, side of the district court.

3.   CONTRACT—*Approval*—In February, C. purchased goods from plain-
tiffs company on credit, and in the following May made a contract with
plaintiff's agent, which was' intended by both parties to be a sale of
the property back to plaintiff.   The agent testified that, if the con-
tract should not be approved by the company, the February contract
of sale should be in force.   C. testified that the contract was not to
take effect until approved by the company, and that such approval
was to be made, and notice given him, within 10 days.   The contract
stated that it was accepted by the agent subject to the approval of the
company.   Notice was not given C. of acceptance until about 20 days
after it was made, and in the meantime C. had executed a chattel
mortgage on the property to defendants.   *Held*, that until approved
by the company the ownership of the property was in C., and the
mortgage thereon was a valid lien,  defendants having no knowledge
of the existence of the contract when they took the mortgage.

4.   GENERAL DENIAL—*Proof of Property Under*—On the trial for the
conversion of the property defendants offered to prove, under a gen-
eral denial, that prior to the execution of the contract in May with
plaintiff's agent, by which he was to sell back the property to plain-
tiff, C. had borrowed $300 of F., and made to him a bill of sale of the
property as security for the loan, and that defendants had succeeded
to all the rights of F. in the property.   An objection that the evidence

was not admissible under a general denial was sustained. *Held*, that the evidence should have been admitted, for, since plaintiff claimed ownership in itself, it was proper, under the general denial, to give any evidence showing right of property and right of possession in another.

5. EXAMINATION OF WITNESS—*Re-direct Examination*—One of defendants was asked on his re-direct examination if he took an inventory of the stock at the time he took possession of it, which was the time of the alleged conversion, and, having answered in the affirmative, was asked to state its actual cash value at that time, which was objected to as not proper re-direct examination. *Held*, that as on his examination in chief the witness was not asked in regard to the value of the property, and the question involved new facts so far as his testimony was concerned, the objection was properly sustained.

6. VALUE OF PROPERTY—*Opinion of Witness*—The question was material, for the value of the property on that day would have to be considered in measuring damages, and it was also competent, for it did not require the opinion of an expert, but was a question which an ordinary witness who knew the property could answer.

*Error to the District Court of Kingfisher County, Hon. A. J. Seay, Judge.*

Action by the Peru Plow & Wheel Co., against Samuel F. Robinson and Clarence L. Gibson to recover damages for the alleged conversion of a stock of farming implements. From a judgment for plaintiff, defendant brings error. Reversed.

*John I. Dille*, and *Cutlip & McCartney*, for plaintiffs in error.

*J. W. McLoud* and *V. M. Hobbs*, for defendant in error.

The opinion of the court was delivered by

GREEN, C. J.: This was an action of trover and conversion, in the district court of Kingfisher county, brought by the defendant in error against the plaintiffs in error to recover damages for the alleged conversion of a stock of farming implements, consisting of plows, harrows and cultivators, and of the value of something

Robinson y. Peru Plow & Wheel Co.

more than two thousand dollars. A trial was had at the October term, 1890, which resulted in a verdict and judgment in favor of the defendant in error for the sum of nineteen hundred dollars and costs of suit. The plaintiffs in error bring the record into this court, by petition in error, and assign the following errors:

"*First.* There was error in the proceeding, by which the plaintiffs in error were prevented from having a fair trial.

"*Second.* There was error in the amount of recovery—the same being too large, and appears to have been given through prejudice.

"*Third.* The verdict is not sustained by sufficient evidence.

"*Fourth.* The verdict is contrary to the evidence.

"*Fifth.* Errors of law occurring at the trial and excepted to at the time.

"*Sixth.* The verdict is contrary to the eighth instructions given by the court.

"*Seventh.* The court erred in the exclusion of testimony offered by plaintiffs in error, and material to the issues.

"*Eighth.* The court erred in refusing to give the third, fourth, fifth and sixth instructions asked by plaintiffs in error.

"*Ninth.* The court erred in giving the first, third, fifth and sixth instructions for defendant in error.

"*Tenth.* Because it does not affirmatively appear from the record that the court had jurisdiction of the cause.

"*Eleventh.* Because it does affirmatively appear from the record that the court had no jurisdiction of the cause.

"*Twelfth.* The petition does not state facts constituting a cause of action.

"*Thirteenth.* There was error in rendering judgment on the general verdict.

"*Fourteenth.* The answer to the eighth interrogatory is not supported by the evidence, and is contrary to the evidence.

"*Fifteenth.* The court erred in overruling the motion for a new trial."

The amended petition, on which the cause was tried in the court below, alleges the following facts:

"*First.* The plaintiff is a non resident of the Territory of Oklahoma, and is a resident of the state of Illinois.

"*Second*, That on, or about, the twenty-eighth day of May, 1890, the plaintiff was the owner, and in possession of the following personal property, describing it, and giving the number of plows, harrows and cultivators, and alleging that the property was located on lot 16, block 7, in the village of Kingfisher.

"*Third*, That in the month of June, 1890, the defendants wrongfully and unlawfully converted said property to their own use, and took possession of the same and have ever since wrongfully detained possession of said property; and that prior to the commencement of this action the plaintiff demanded possession of said property from said defendants, which demand was refused by the defendants.

"*Fourth*, That the plaintiff is still the owner of said property, and that the property is of the value of $2,082.07, which sum is due and payable from the defendants to the plaintiff, and the plaintiff demands judgment for the value of said property in the sum of $2,082.07, with interest from the date of the judgment at the rate of 7 *per cent.*, and costs of suit."

To this amended petition the plaintiffs in error appealed and answered, admitting: *First*, the allegations of the first paragraph of the petition; and denying: *Second*, all the other allegations of the petition.

Before proceeding to a statement of the facts of the case, it may be well to dispose of the error assigned, that the petition does not state facts sufficient to constitute a cause of action; for if no cause of action is stated in the petition, there was nothing upon which the judgment could be rendered; and it is the settled law, that a declaration or petition which does not state a cause of action, will not support a judgment,

In the common law action of trover and conversion,

'.he material averments are, that the plaintiff is the owner of the property, describing it with reasonable certainty, and that the defendant wrongfully took and converted the property to his own use; or that the defendant, being in the lawful possession of the property, wrongfully converted the same to his own use, and that the plaintiff was entitled to the possession at the time of such conversion. The *gist* of the action is the wrongful conversion of the property; and the *fiction* of the finding of the property by the defendant was never traversable. The petition in this case does aver all the facts, which are necessary to constitute the cause of action; that the defendant in error was the owner of the property, and that the plaintiffs in error wrongfully took and converted the same to their own use, describing the property and alleging its value; and the petition was legally sufficient.

It appears from the bill of exceptions, that one B. V. Cummins, of the town of Kingfisher, on the 18th day of February, 1890, at Kansas City, Mo., signed an order for the property in controversy in this suit; and in pursuance of which the property was shipped and delivered to him, at Kingfisher. The contract was made with one T. H. Martin, as the agent of the Peru Plow and Wheel Co., and was written on one of the company's blanks; and its provisions, so far as they are material, are as follows:

"Please ship the following order for plows, *etc.*, on or about, March 10, marked B. V. Cummins, Kingfisher, I. T., at list prices annexed, less a discount of 40 *per cent,,* (except where net prices are designated). Discount on all repairs 25 *per cent*, for which *we* will pay you (with exchange or express charges) as folllows: (See back of contract.) Cultivators and gophers net, payable October 1, 1890. All other goods, payable July 1, 1890, for spring trade, and Nov. 15th, for fall trade. All payments to draw ten *per cent*, interest on

cultivators and gophers, after Oct. 1, 1890, and on all other goods, after July 1, 1890, for spring trade, and Nov. 15th, for fall trade.

"In consideration of the exclusive sale of your plows: in Kingfisher and vicinity, for the coming spring trade I agree to handle no other make of plows, during same period, nor to countermand this order, except on payment of 20 *per cent*, of the net amount of goods hereby purchased to the Peru Plow and Wheel Co., as liqui- dated damages.

"The notice and conditions on opposite page are made a part of this contract, and order · is given subject to conditions mentioned therein.

B. V. CUMMINS,

Accepted, subject to approval of Peru Plow and Wheel Co.

T. H. MARTIN,.<br>Agent."

On the back of this order, under the head of remarks;. is the following indorsement:

"B. V. Cummins to remit in cash, every 30 days, for all goods sold, and, for all remittances made, is to have a cash discount of 8 *per cent*. Goods on hand, June 1st, to be settled for as per contract within."

And this contract was approved by the Peru Plow and Wheel Co., on the first day of March, 1890.

After the property was shipped to, and received by Cummins at Kingfisher, he engaged in the business of retailing the same, until about the 28th day of May, 1890, when he again called on Martin, the agent of the company, at Kansas City; and, after a conference be- tween them, a new contract was agreed upon, as to so much of the property as had not been sold by Cum- mins, and was written upon one of the company's blanks and was signed by Cummins and Martin, subject to the approval of the company; and the property embraced in this new contract is the property in controversy in this.

suit; and the new contract, as near as it can be copied
from the original, is as follows:

"K. C., May 28th, 1890.
Peru Plow and Wheel Co., Peru, Illinois:

"All freight east of Council Bluffs, Iowa, or Kansas
City, Missouri, to be credited on receipt of paid freight
bill at factory.

"Goods on hand, embraced in bill of March 17, 1890,
at list prices annexed, less a discount of 40 *per cent*,
(except where net prices are designated). See back of
contract.

"In consideration of exclusive sale of your plows in
Kingfisher, El Reno and vicinity, for the coming fall
trade, * * * * * agree to handle no other m ıke
of plows, during same period, nor to countermand this
order, except on payment of 20 *per cent* of the net
amount of goods hereby purchased to Peru Plow and
Wheel Co., as liquidated damages.

"The notice and conditions on opposite page are
made a part of this contract, and order is given subject
to conditions mentioned therein.

B. V. CUMMINS."

"Accepted, subject to approval of Peru Plow and
Wheel Co.

T. H. MARTIN,
Agent."

And under the head of "Guaranty," on one of the
pages of the blank, is the following written provision:

"In case Peru Plow and Wheel Co. want any of the
within goods reshipped to any point named by them, B.
V. Cummins to load same on cars, at a cost not to ex-
ceed drayage of same. Provided this contract is not
accepted by the Peru Plow and Wheel Co., the original
contract to remain in force."

And, indorsed on the contract, under the head of
"Remarks;" is the following further written provision:

"B. V. Cummins to remit cash for goods sold, every
thirty days, and, for all remittances so made, to receive
a commission of 8 *per cent.*

"Goods on hand, as enumerated within, are the prop-
erty of the Peru Plow and Wheel Co., and subject to

their order.    B. V. Cummins to keep same in suitable,
dry place, and to use due diligence in disposing of the
same."

There is also written on this contract the approval of
the Peru Plow and Wheel Co., as of May 31, 1890.

It appears, from the evidence in the case, that there
was no change of the possession of the property, after
the making of the contract of May 28th; and the same
remained in the possession of Cummins; and at the same
place in the town of Kingfisher; and Martin, the agent
of the company, testified that he appointed Cummins
the agent of the company to sell the property, and that
the company took, and had, possession of the property
on and after May 28, 1890, by Cummins as its agent.
He also testified that the contract of May 28th took ef-
fect on that day, and was to remain in force, unless dis-
approved by the company, and that on such disapproval
the original contract should be revived; and that the
company did approve the contract on the 31st day of
May, 1890.

The testimony of Cummins contradicts the testimony
of Martin in many important particulars.    He testified
that the contract of May 28th was not to take effect un-
til approved by the company, and until notice of such
approval was served upon him; and that, unless such ap-
proval and notice were made and given, within ten days
from the date of the contract, the original contract
should continue as the contract between him and the
company; and that no notice of approval was given him
by the company until the 16th day of June, 1890, and
after the expiration of the ten days.

On the 12th day of June, 1890, B. V. Cummins bor-
rowed of the Commercial bank at Kingfisher the sum of
five hundred dollars, and he and his wife executed their
promissory note to the bank for that amount, and, for
the purpose of securing the payment of the note, they

executed and delivered to the bank a chattel mortgage on the property in controversy in this suit, which was the same property embraced in the contract of May 28, 1890; and, on the 16th day of June, and before the commencement of this suit, the plaintiffs in error, Robinson and Gibson, acting for the bank, took possession of the property mortgaged under an *insecurity clause* in the mortgage, and refused to deliver the same to the defendants in error on demand made therefor. At the time the bank loaned the money to Cummins, and took the chattel mortgage to secure the loan, it paid to one Fox the sum of three hundred dollars, for which Fox transferred to the bank whatever right he had in the property by virtue of a certain bill of sale; and the chattel mortgage was filed with the county clerk on the 13th day of June, 1890, as required by the statutes of Nebraska, then in force in this Territory. After the making of the chattel mortgage, and until the bank took possession of the property, Cummins was left in possession as the agent of the bank, and accounted to the bank for the proceeds of all sales made during that time.

Fifteen errors in all have been assigned upon the record; but it will not be necessary to consider all of them, as some are but a repetition of other, and most of them are included in the error alleged to have been committed in overruling the motion for a new trial, and we shall not consider them in the order of their assignment.

The first assignment of error, which we wish to consider, challenges the jurisdiction of the court below to render the judgment complained of, on the ground that the suit was brought on the Federal side of the court, and the citizenship of the parties was not such as to give that side of the court jurisdiction; and it is well settled law that, if the court below had no jurisdiction,

the judgment must be reversed. The objection is fatal at every stage of the proceedings, and the judgment is a nullity; and where the law does not give jurisdiction, consent of parties cannot give it, and it is not waived by pleading and going to trial without objection. *Bingham v. Cabot*, 3 Dallas, 382; *Turner v. President, etc.*; 4 Id., 8; *Wood v. Wagnow*, 2 Cranch, 9.)

The district courts of the Territory of Oklahoma have, and may exercise, the same jurisdiction as the circuit and district courts of the United States, in both civil and criminal actions (*Organic Act, Sec. 9*), and as Territorial courts they have jurisdiction of all cases at law and in equity, irrespective of the citizenship of the parties and the amount involved in the controversy. But the Federal and Territorial sides of the district courts are separate and distinct; as much so as if they were separate courts, and presided over by different judges. And this distinction has been recognized and enforced by the supreme court of the United States. (*Ex parte Crow Dog*, 109 U.S., 560; *Gon-Shay-ee*, 130 U. S., 343.)

It is clear, then, that if this suit is to be treated as a suit brought and prosecuted to judgment on the Federal side of the court below, that the court was wholly without jurisdiction to hear and determine rights of the parties; for the citizenship of the parties, as averred in the petition, was not such as to give the court jurisdiction on the Federal side; —the plaintiff below being a citizen of the state of Illinois, and the defendants below being citizens of the Territory of Oklahoma.

In the case of the *Corporation of New Orleans v. Winter*, 1 Wheaton, 91, the court by Marshall, C. J., said:

"It has been attempted to distinguish a territory from the District of Columbia; but the court is of the opinion that the distinction cannot be maintained. They may differ in many respects, but neither of them

is a state, in the sense in which that term is used in the Constitution.   Every reason assigned for the opinion of the court, that a citizen of Columbia was not capable of suing in the courts of the United States under the judiciary act, is equally applicable to a citizen of a territory."   (See also, *Dundas v. Ellzey*, 2 Cranch, 445.)

The court in which this suit was brought, is described in the petition of the defendant in error, who was the plaintiff below, as follows:   "In the United States District Court, in and for the second judicial district of the Territory of Oklahoma;" but the summons in the case describes the court as "the district court of the Territory of Oklahoma, United States of America, for the Fifth county the. eof," and was directed to the sheriff of that county, and served by him; and, inasmuch as the cause was treated as pending in the district court of the Fifth county, and on the territorial side of the court, which had jurisdiction of the subject matter and of the parties, the words in the petition and other parts of the record, which misdescribe the court, may be rejected as surplusage, and the maxims applied, *surplus agium non nccet* and *utile pcr inutile non vitiatur*.   It should not be presumed that the defendant in error intended to bring the suit in the district court of the United States; for that court, no matter what may be the citizenship of the parties, has no jurisdiction of an action of trover, and no attempt was made to describe the court as the circuit court of the United States.

Before passing to a consideration of other errors assigned, it becomes necessary to determine what title, or interest in the property in controversy, was vested in Cummins, under and by virtue of the order and contract of February 18, 1890.

That Cummins became the absolute owner of the property admits of no doubt.   Martin swears that the sale and delivery were absolute; but without such evidence a proper construction of the contract itself

fixes the ownership of the property in Cummins; and such ownership was recognized by the defendant in error, at the time of the making of the contract of the date of May 28th, 1890. And it makes no difference that the purchase money was not paid; for the sale was on credit, and the company reserved no lien on the property, and no right to reclaim it if it should not be paid for, and trusted wholly to the individual responsibility and liability of Cummins; and the legal effect of the transaction was to vest the absolute title and possession of the property in Cummins.

The case of *Blanchars vs. Fitzpatrick*, 146 Mass., 24, is a case strongly in point, and in a short opinion the court said:

"It is sufficient to say that it does not appear by the agreed facts that the plaintiff, at the time he sued out his writ, was entitled to the immediate possession of the goods replevied. The agreed statement is not as full and clean as might be desired, but it does not appear that any conditions were attached to the delivery of the goods by the plaintiff to Fickett & Harriman, and the reasonable constructions of the agreed statement is, that the goods were sold to Fickett & Harriman on credit, and were to be paid for by them in monthly payments, at an agreed price, when they were sold by them. On this construction an absolute title to the goods passed to Fickett & Harriman when the goods were delivered to them."

As then, the absolute ownership of the property in controversy was in Cummins, and he was in the actual possession of the same, at Kingfisher, under the order and contract of February 18, 1890, how were such ownership and possession affected by the contract of May 28, 1890, with reference to Cummins to make the chattel mortgage of the date of June 12, 1890, to the Commercial bank, and with reference to the right of the bank to make the loan of money to Cummins on the security of the chattel mortgage?

On the trial, in the court below, much controversy arose as to whether the written parts of the contract of May 28, 1890, under the heads of "Guaranty" and "Remarks," were parts of that contract, but for the purposes of this opinion we shall treat them as parts of the contract, and give them such effect as the law requires.

The contract of May 28, 1890, was intended by Cummins and Martin to be a sale of the property by Cummins to the Peru Plow and Wheel Co.; and an important question is, was the contract so far executed by the vendor and vendee as to vest the title to the property in the company as of the date of that contract? And, if not vested then, did it vest at any time after that, and before the making of the chattel mortgage to the Commercial bank, on the 12th day of June, 1890?

The testimony of Martin is to the effect that the sale by Cummins to the company was consummated and complete on the 28th day of May, 1890; and that Cummins was then appointed agent of the company, and was in the possession of the property, from that date, as such agent and for the company, and, if the contract should not be approved by the company, the contract of February 18 should be revived and continue in force. But Cummins testified that the contract of May 28 was not to take effect until approved by the company; and that such approval was to be made and notice given to him within ten days; and, that if such approval and notice were not made and given within the ten days, the contract was to have no effect, and the contract of February 18 was to continue; and that no notice of approval was given him until the 16th day of June, 1890, and after the making of the chattel mortgage to the Commercial bank. Martin testified that he did not remember the agreement as to the giving of the notice within ten days, but admits that he gave Cummins notice, in writing, of the approval of the contract by the

company, on the 16th day of June, 1890, and that such notice was given at the request of Cummins.

Independent of the testimony of Martin and Cummins as to when the contract of May 28 was to take effect, the contract itself contains the following provisions: ''Accepted subject to approval of Peru Plow and Wheel Co. T. H. Martin, agent; and provided this contract is not accepted by the Peru Plow and Wheel Co., the original contract to remain in force."

From these provisions of the contract of May 28, 1890, it is clear, as a matter of law, that the contract was not to become operative as such until it was approved by the Peru Plow and Wheel Co. and was accepted by the ocmpany in *lieu* of the contract of February 18, 1890; and the title to the property did not vest in the company while the contract was *in fieri*. In order to vest the title in the company it required the performance of the conditions precedent, which was the approval and acceptance of the contract, and the giving of notice of such approval and acceptance to Cummins, if the contract, or the law as applicable to the contract, required such notice.

If the fact of the approval and acceptance of the contract, and that notice was to be given to Cummins, within ten days, as a condition precedent to the taking effect of the contract of May 28, 1890, is determined by the oral evidence in the record, there can be no doubt that the agreement was made as sworn to by Cummins; for Cummins swears that he was to have notice, within ten days, of the approval and acceptance of the contract, while Martin states that he does not remember such an agreement, and no other witness testified as to the fact. The affirmative and positive statement of Cummins is not contradicted by the negative statement of Martin, that he does not remember such an agreement; nor is it contradicted by any other oral evidence

in the record; and, upon the oral evidence, the fact that Cummins was to have notice, within ten days, must be regarded as fully established.

The contract of May 28, 1890, contains no express provision that notice was to be given to Cummins of the approval and acceptance of the contract by the Peru Plow and Wheel Company; but what is the legal effect of that contract as to such notices?

As the contract of February 18, 1890, was to continue in force, if the contract of May 28, 1890, should not be approved and accepted by the company, the law itself imposed upon the company the duty of giving Cummins notice of the approval and acceptance of the contract, within a reasonable time, and such notice was essential to the taking effect of the contract. How could Cummins know, without such notice, that the contract of May 28, 1890, had been approved and accepted by the company? The fact of the approval and acceptance of the contract was peculiarly within the knowledge of the company; and, in such cases, the law requires notice as a condition precedent to the taking effect of the contract.

An eminent writer on the law of Sales of Personal Property thus states the rule:

"If the sale is made to depend upon the happening of some contingent event, the ordinary rule is, that the seller must ascertain, at his own peril, when the event happens, and tender delivery promptly, if he wants to hold the buyer to his contract. The buyer is ordinarily not required to give the seller notice of the occurrence of the contingency. But the giving of the notice by the buyer may be made the condition precedent to the performance of the contract by the seller, so that the seller is not required to deliver the goods until the buyer notifies him of the occurrence of the contingency. This is not only the case where the parties expressly provide that the buyer shall notify the seller, but the buyer's obligation to give notice may be implied from the fact

that the occurrence of the contingent event is not equally within the knowledge of both parties. If the fact, or contingency, is peculiarly within the knowledge of the buyer, and it is not equally accessible to the seller, it is presumed that the parties intended that the buyer should give notice of its occurrence, before he could require the seller to perform the contract." (Tiedeman on Sales, § 211.)

It follows then that the contract of May 28, 1890, had not taken effect so as to vest the the title to the property in the Peru Plow and Wheel Company on the 12th day of June, 1890, when the chattel mortgage was made to the Commercial Bank; and the absolute ownership of the property was in Cummins at that time; and the mortgage became a valid *lien* on the property as against any claim of the defendant in error under that contract; for it is not pretended that the plaintiffs in error had any notice or knowledge of the existence of the contract of May 28, 1890, and they stand in the attitude of *bona fide* purchasers for a valuable consideration without notice.

On the trial in the court below the plaintiffs in error offered to prove under their answer, which was a general denial, that between the 18th day of February, 1890, and the 28th day of May, 1890, Cummins had borrowed three hundred dollars of one Fox, and had made to Fox a bill of sale of the property in controversy, as security for the indebtedness; and that the plaintiffs in error had succeeded to all of the rights of Fox in the property. On objection by defendant in error that the evidence was not admissible under the general denial, the objection was sustained by the court, and the evidence was excluded from the jury, and an exception to the action of the court was duly taken.

It is a well settled rule of code pleading, that the defendant under the general denial may controvert, by evidence, every fact which the plaintiff is bound to

prove in order to recover in the action; and one of the
material facts averred in the petition of the defendant
in error was that the Peru Plow and Wheel Company
was the owner of the property in controversy at the
time of the alleged conversion, and proof of right of
property and possession in Fox at the time of the con-
version, was admissible, under the general denial, as
tending to disprove the fact that the defendant in error
was the owner of the property and entitled to recover
its full value. And the evidence was admissible
whether the plaintiffs in error connected themselves
with the title of Fox or not.

In *Griffin v, Long Island Railroad Company*, 101 N.
Y. 348, which was an action of replevin in the *detinet*,
brought to recover possession of certain railroad cars,
and in which the general denial was pleaded under the
code, the court said:

"It was necessary, therefore, for the plaintiff to show
his title to the cars; and what it was necessary for him
to show to maintain his action, the defendant had the
right to controvert by proof under the general denial.
The general denial put in issue not only the wrongful
detention, but the plaintiff's title, and upon that issue
it had the right to show, not only title in itself, but title
out of the plaintiff and in a stranger. The plaintiff,
seeking to take property out of the possession of the
defendant, was bound to show title in himself, and the
defendant could defend itself by showing that he did
not have title, and thus did not have the right to take
from it the possession which it had acquired."

The reason for the rule is much stronger in an action
of trover and conversion than it is in an action of
replevin in the *detinet;* for, in an action of trover,
such as this, in which the plaintiff counts on title to the
property, and demands the full value as damages, a
recovering to that extent vests the title to the property
in the defendant.

In *Hostler's Administration v. Skull*, American

Decisions, 583, which was an action of trover for a slave, the rule of law is announced in the syllabus of the case as follows:

"Trover is founded on the right of property exclusively, and. therefore, the plaintiff cannot recover if defendant prove property in another when the conversion took effect."

And in the opinion the court said,

"Possession alone will enable a person to maintain an action of tresspass as against a stranger; and then damages are given for the tortious taking, all claim to which is waived by bringing an action of trover. It is a fundamental distinction between the two actions that the one is founded in property, the other, in possession; and it is necessary to attend to this, because a recovery in trover vests the property sued for in the defendant."

The bill of sale was made by Cummins to Fox, cn the 18th day of March, 1890, and is absolute on its face; and, if valid, it transferred the title to the property to Fox; and this transaction took place between Fox and Cummins, before the making of the contract of May 28, 1890, under which the defendant in error claimed title to the property. If the title to the property was in Fox, at the time of the conversion by the plaintiffs in error, it was not in the defendant in error; and the evidence was admissible to disprove property in the plaintiff, which the plaintiff was bound to prove in order to maintain the action, and the court erred in excluding it from the jury.

It appears from the record, that Robinson, one of the plaintiffs in error, was sworn, and testified as a witness on behalf of the defendants below. On re-direct examination he was asked the following questions:

"Q. You may state to the court and jury whether you took an inventory of the stock, at the time you took possossion of it? A. Yes, I took an invoice of the entire stock.

"Q. You may , now, state what was the actual cash

value of the stock of farm implements, on the 16th day of June, when you took possession of it?"

This last question was objected to, on the ground that it was "incompetent, immaterial, and not proper re-direct examination;" and the objection was sustained by the court, and an exception taken.

The alleged conversion of the property by the defendants below took place on the 16th day of June, 1890, when the plaintiff below demanded the property and the defendants refused to surrender it; and the value of the property, on that day, was a material inquiry in the case; as the measure of damages in an action of trover is the value of the property, at the time of conversion, with interest. (2 Sedgwick on Damages, § 493.)

It is insisted that the objection to the question propounded to the witness was properly sustained, because he was not qualified to testify to the value of the property, as he was not an expert in the business of buying and selling farming implements. If the court sustained the objection on that ground, it was a clear misapprehension of the law; for it was not a question requiring the opinion of an expert witness, but one which any ordinary witness, who knew the property, could answer. The authorities are clear to the point, that a witness, who is not an expert, and who is acquainted with real estate, may testify to its value; and, *a fortiori* may any ordinary witness, who is acquainted with personal property testify to its value. (Rice on Evidence, p. 336.)

But was the objection sustainable, under the rules of evidence, on the ground that it was not a proper re-direct examination of the witness? On the examination in chief the witness was not interrogated *quoad* the value of the property; nor was he on the cross-examination; and the inquiry involved on entirely new facts,

so far as the testimony of Robinson was concerned, and was not proper on re-direct examination.

It is the office of an examination in chief to lay before the courts and jury the whole of the evidence of the witness that is relevant and material; and the office of a re-direct examination is to explain, to rectify, and put in order such matters as have been affected by the cross-examination; and, if the strict rules of examination are followed, the party who produces witnesses is bound to ask all material questions on the direct examination, and, if this is omitted, it cannot be done on the re-direct examination; for no new question can be put on the re-direct examination, which is not connected with the cross-examination, and which does not tend to explain it. Mr. Chamberlayne, in his well known edition of Best's Law of Evidence, in his note to § 644, says: "Re-direct examination is confined to explanation and rebuttal. It is limited to the precise matters upon which the witness has been cross-examined. Its scope, therefore, varies with that of the cross-examination, of which it is a supplementing incident."

This is the universal rule; but re-examination as to new matter is in the direction of the courts. (*Brown v. Burrus*, 8 Mo. 26; *Wickenkamp v. Wickenkamp*, 77 Ill. 92; *Schlenker v. State*, 9 Neb. 241.)

It is, also, assigned for error, that the damages assessed by the jury are excessive, and not supported by the evidence, and were the result of prejudice on the part of the jury. The only witnesses who testified as to the value of the property were Martin and Cummins, and we are not prepared to say that the verdict, as to the amount of damages, was so manifestly against the weight of the evidence as to require a reversal of the judgment on that ground. When the questions to be determined by the jury are questions of fact, and the law has been correctly given by the court, the verdict

will not be disturbed on appeal or writ of error, unless it is manifestly, and, at first blush, against the weight of the evidence.    This rule is so well settled that it needs no citation of authorities.

Exceptions were taken by the plaintiffs in error to the action of the court in giving and refusing instructions; but we deem it unnecessary to examine the instructions which were given, or those which were refused, in order to determine whether or not they state correct propositions of law.    Upon another trial the instructions shoutd be made to conform to the law as announced in this opinion.

For the errors of law occurring at the trial, and excepted to by the plaintiffs in error, the verdict of the jury should have been set aside and a new trial granted; and the court erred in overruling the motion for a new trial.

The judgment is reversed with costs, and the cause remanded, with directions to the court below to award a *venire facias de novo.*

Reversed and remanded.

All the Justices concurring.