### ALBERT PRINCE v. STATE OF NEBRASKA.

#### FILED NOVEMBER 27, 1912. No. 17,716.

Homicide: DEFENSE OF INSANITY: EVIDENCE. Plaintiff in error was convicted of the crime of murder in the first degree and sentenced to death. On error to this court, no question of law as to procedure is presented. The defense was insanity at the time of the killing, and the case is presented upon the sole question of fact as to the accountability of the accused. Upon a review of the evidence, it is *held*, by a majority of the court, that the judgment and sentence should be affirmed.

ERROR to the district court for Lancaster county: ALBERT J. CORNISH, JUDGE. *Affirmed.*

*A. E. Howard* and *Price & Abbott,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

REESE, C. J.

On the 17th day of February, 1912, the county attorney of Lancaster county filed in the office of the clerk of the district court for said county an information against Albert Prince, charging him with the crime of murder in the first degree by cutting and stabbing one Edward D. Davis

so that from the effects thereof the said Davis died. The information is in the usual form followed and prescribed in such cases, and, as its sufficiency is not here questioned, it will not be necessary to set it out in detail. The accused was arraigned in open court, and entered the plea of not guilty. A jury trial was had, which resulted in a verdict finding him guilty as charged in the information, and fixing the punishment at death. A motion for a new trial was filed and overruled, when sentence of death was pronounced, and fixing the date of execution on the 30th day of August, 1912. The case is now presented to this court for review by petition in error, and, under the constitutional provision, all further proceedings are thereby stayed pending such review.

No serious question of law as to the procedure is presented by the briefs or was argued upon oral argument. The killing of Davis, while denied by the plea of not guilty, is not controverted, but was admitted by plaintiff in error while upon the witness stand in his own behalf. It is contended, however, that, at the time of the killing, plaintiff in error was insane and not legally responsible for his act, and evidence was introduced tending to support the contention. Counter evidence was introduced by the state tending to disprove the claim of insanity. The question of the sanity or insanity of a defendant in a criminal prosecution is, usually, largely a question of fact to be solved by the trial jury under proper instructions, yet in a case involving the life, or even the liberty, of a human being, the courts will not hesitate to look carefully into the evidence, and, if the verdict is not supported thereby, grant the needed relief or correct the error in such way as the condition of the proofs may suggest.

The bill of exceptions is quite voluminous, consisting of about 600 pages of typewritten matter. It has all been carefully read. The uncontroverted facts may be said to be that plaintiff in error is and was at the time of the tragedy an inmate of the Nebraska penitentiary, serving under a sentence imposed for a violation of the criminal

law of the state, and was laboring in the broom factory then being carried on in the building. The decedent was the deputy warden, and was largely in charge of the discipline and control of the prisoners. A short time prior to the 11th day of February, 1912, plaintiff in error secreted a knife used in the broom factory and carried it to his cell, keeping it in his pocket. The date named was on a Sunday, and, when the inmates were assembled for the usual chapel exercises, he carried the knife with him into the chapel. The usual place of the deputy warden during the exercises was pretty well to the front in the audience, and near the close of the service it was his custom to pass down the aisle toward the entrance door through which the assembly would pass out. Plaintiff in error was seated near the aisle and not far from the door, and when the last hymn was being sung—the audience standing—the decedent walked down the aisle between the standing rows of men, and, when he came opposite and near plaintiff in error, plaintiff in error stabbed him a number of times in quick succession, and from which death soon after resulted. A guard approached plaintiff in error, to whom he surrendered the knife without resistance, and was led away and placed in the solitary confinement cell. He was a witness in his own behalf on the trial, and with commendable frankness admitted that he had made preparation to take the life of either the warden or the deputy, as opportunity might offer, and that in taking the life of the deputy he had carried out his previously conceived purpose and intention.

The evidence tends strongly to show that at one time, under a previous administration of the affairs of the prison, plaintiff in error was subjected to a long and, from his point of view, a cruel administration of discipline. The evidence shows that he had been guilty of an act of insubordination and defiance of authority, and it was necessary to maintain the rules and discipline of the prison; but, whether it was necessary to carry the punishment to the extreme to which it was carried, we are not

called upon to decide.  The complaint made by plaintiff in error was that in the first instance he had violated no rule of the prison, and that he was never informed of what charges were against him, and does not know to this day, but that his whole treatment up to the time of the incident referred to was arbitrary, vindictive, tyrannical, and without cause.  The testimony of the guard under whom he worked, called by the state, was that prior to that time plaintiff in error had been a faithful worker, pleasant, affable, and agreeable, and that he was obedient to the rules of the prison, causing no annoyance or trouble whatever.

There was considerable evidence offered by the defense that from that time his mental condition appeared to undergo a change; that he became "moody," absent-minded, and when not at work would sit, resting his head upon his hands, lamenting his fate, frequently saying the officers and guards "had it in for him," and would beat and otherwise mistreat him without cause.  There seems to be little doubt but that during the administration of a subsequently appointed warden the management of some of the prisoners was cruel and brutal, and it was stated by the witnesses that this seemed to affect plaintiff in error's mind, he often referring to the treatment others had received, and which he deemed unreasonably harsh and severe; that during the later times, prior to the tragedy for the commission of which he was convicted, his mind seemed to wander; that his continuity of thought was impaired, and he could be induced to converse upon one subject for only a very short time, and his mind would "fly from one subject to another."  Much of the evidence in his behalf was given by convicts and ex-convicts, while the opposite was maintained by the guards and some of the convicts yet serving time.  It is gratifying to note that all the witnesses testified to a much more reasonable and humane system of government of the prison by the present warden and officers.  The cruel and inhumane treatment of plaintiff in error and others, it is claimed, so weighed and preyed

upon his mind as to destroy his accountability for his acts, dethrone his judgment, and weaken his appreciation of the enormity of his act. He took the witness-stand in his own behalf and testified, with candor and intelligence, what he understood to be the moving cause of his own treatment and the treatment of others, and that he contemplated taking the life of the then warden or his deputy, and that he believed he would be doing right in the act, and believed he was doing right in taking the life of the deputy, for which he was being prosecuted. There seems to be no claim that he was otherwise than sane at the time of the trial. If we assume that the evidence offered on his behalf at the trial was all, or substantially all, true, it would be difficult to find any justification for the infliction of the death penalty.

Among the witnesses called by the state were certain physicians who were summoned to the bedside of the decedent, all of whom conversed with, or heard others converse with, plaintiff in error soon after the tragedy, and they all testified that they saw no indication or symptom of insanity during the conversations had; that he did not appear to be under any mental excitement, but conversed freely upon what he had done, and was ready and willing to receive punishment therefor. Two local alienists were called who made an examination of plaintiff in error during the trial, and both testified to the absence of any symptom of existing or previous insanity. Guards and others from the penitentiary testified on behalf of the state that they had discovered no symptoms of mental aberration in the conduct or manner of plaintiff in error either before or after the tragedy, and some deny the truth of the charges of needless cruelty to other prisoners; but it appears to be well established that such charges were made and believed in by the inmates, and that they were heard and believed by plaintiff in error.

The fact that a delusion existed, if such were the fact, would produce the same effect upon the party deluded as if the belief were based upon the real fact. The legal

presumption originally is that all people are sane, and that presumption continues until evidence to the contrary is introduced. That presumption applied to plaintiff in error in the first instance. Upon evidence being introduced to show mental derangement, it devolved upon the state to prove his sanity at the time of the commission of the act charged beyond a reasonable doubt. There is also a presumption that, where a state or condition is shown to exist, it continues until shown to have been removed. This applies to the mental condition of people. Judging by the evidence of the acts, conduct and manner of plaintiff in error, there may be some doubt whether his act was prompted by a diseased mind, or a desire for revenge as against the warden and deputy for acts of oppression and cruelty of which he deemed them guilty. If the former, he should not be held to the infliction of the extreme penalty. If the latter, there would be, in law, no extenuation. While these questions were largely for solution by the jury, yet, in the interest of human life, the duty of carefully considering the evidence is ultimately devolved upon the courts. From a consideration of all the evidence and a contemplation of the mainsprings of human conduct, it is the conviction and firm opinion of the writer hereof that plaintiff in error should not and cannot be held guiltless, but that he did not and does not deserve the taking of his life; but that he should be confined in the prison during his life as a protection to society, and that the sentence of the court should be reduced from execution to that of life imprisonment.

However, a majority of the court are of the opinion that there is no proper cause shown why the judgment of the district court should be interfered with, and it will therefore have to be affirmed. The time fixed by the district court for the execution of plaintiff in error having passed, it is ordered that the sentence be carried out on Friday, the twenty-first day of March, 1913.

**AFFIRMED.**