MANGNUS TORSKE v. STATE OF NEBRASKA.

FILED APRIL 29, 1932.  No. 28114.

*Carrico & Carrico*, for plaintiff in error.

*C. A. Sorensen, Attorney General*, and *Clifford L. Rein*, *contra.*

Heard before GOSS, C. J., DEAN, GOOD, DAY and PAINE, JJ., and LANDIS and RAPER, District Judges.

DAY, J.

Torske was convicted of murder in the second degree and sentenced to 17 years in the penitentiary, from which he prosecutes error proceedings to this court. The plaintiff in error is charged in the information with killing Lewis C. Paulsen, an attorney at law of Hastings, at or near North Platte. The only question of fact litigated was whether or not Torske was sane when he fired the fatal shot. The record is otherwise without dispute that he purposely and maliciously killed Paulsen. The complaint of the plaintiff in error is directed (1) to the admission of the testimony of experts as to sanity, and (2) to certain instructions of the court to the jury.

The tragedy, which resulted in the death of Paulsen, occurred February 27, 1931, upon the farm occupied by Torske near North Platte, Nebraska. The defendant, a tenant farmer, was living upon this place with his family, where he had moved five years before from Minden, Nebraska. While living near Minden, he commenced a series of business transactions with one Kennedy, which continued for a long period of time, and the result of which was that he was continuously and increasingly indebted to Kennedy. During the entire time Torske lived at North Platte, Kennedy and Paulsen, his attorney, were frequent visitors at his home for the purpose of collecting or renewing notes and mortgages to evidence the indebtedness. Among the items included in these transactions were notes for several hundred dollars given to Paulsen and assigned to Kennedy. Defendant claimed certain credits to which he was entitled and which had not been given to him. These items had been in dispute

since 1927, up to the time of Paulsen's death. Each time a new note was given, additional security was demanded and a controversy arose, which terminated in a quarrel of some bitterness between defendant and Paulsen.

This continued from time to time until January 29, 1931, when Kennedy and Paulsen called at defendant's home, at which time an argument ensued about the indebtedness and the credits claimed by the defendant. A demand was made for the mortgaged property. There was again the usual argument between defendant and Paulsen, and finally Paulsen was ordered to leave. Kennedy then had a talk with defendant, and it was agreed that defendant and his son were to come into town that afternoon and fix up the matter. This was done by the son giving a mortgage upon some of his property as collateral security for the defendant's debt. Thereafter, on February 25, Paulsen called the defendant by long distance telephone and demanded possession of the mortgaged property. This was refused by the defendant, who contended that the due date on his indebtedness had been extended. The next day the defendant went to Minden and had a conference with Kennedy. Two days thereafter Kennedy and Paulsen called at defendant's home and demanded that he turn over some horses as a payment upon his debt. Again an argument took place between Paulsen and defendant which resulted in the defendant ordering Paulsen off the place, with which order he complied. After some suave conversation, in which Kennedy told defendant that he ought to adjust the matter, because if he did not Paulsen would start a replevin action and take all his live stock and machinery covered by the mortgage, they got into Kennedy's car and overtook Paulsen walking back to town and brought him back, when defendant agreed to turn over certain horses after dinner. At the appointed time Kennedy returned bringing Paulsen with him. The defendant had requested Kennedy not to bring Paulsen back.

The controversy and quarrel was renewed, but an agreement was reached whereby the defendant was to

deliver 16 head of horses at North Platte for an agreed price of $50 a head which was to be credited on the debt. There was an argument that two more horses should be included. The defendant demanded credit upon the notes before he moved the horses. Paulsen refused to indorse the credit until the horses were delivered. The argument broke out again about the disputed credits, during which time the defendant went to the barn to turn out some calves. While doing this he saw a shotgun left in the barn by one of his sons, which he picked up and with it shot Paulsen. The foregoing statement of facts is established by the record without dispute.

The defendant interposed the defense of insanity. To support this he relied upon the testimony of his wife and three sons, Arnold, Raymond and Viggo Torske. The son, Viggo Torske, testified that he heard the quarrel and walked to a place where he could see his father with the gun. He testified that his father was very excited, his eyes bulged out and glassy, was still quarreling with Paulsen when he fired the fatal shot. This son took the gun and then helped to pick up the body of Paulsen. He did not remember where his father went, but while engaged in getting Paulsen's body into the car saw his father coming from the house with another gun, and he yelled three or four times at the top of his voice, "Leave him lay there." "He was swinging the gun in all directions, eyes were bulged out and he was as white as a sheet, his eyes were glassy and I took one look and jumped out of the car and beat it." This witness then ran, as did his brother Raymond and Kennedy. The defendant brought Kennedy back and talked to him about the claimed credits and ordered Kennedy to write a memorandum relative to them. Kennedy complied with his request. Whereupon, he said he would kill himself, and ordered Kennedy and his two sons around the barn out of sight, when the defendant discharged the gun twice without effect. Then the officers drove upon the scene and quieted the defendant. Obviously, we cannot detail all the testimony in this opinion, but the foregoing is a substantial statement

of the son Viggo Torske and is corroborated almost in its entirety by Raymond. After a delineation of these facts both Viggo and Raymond were asked whether at the time the shot was fired their father was sane or insane, and the answer of both was that he was insane. Mrs. Torske testified as to the defendant coming into the house after the second gun, immediately after Paulsen had been killed, and as to his appearance and actions, and that at that time in her judgment he was crazy. Kennedy, a witness for the state and the only eyewitness to the tragedy except Viggo Torske, denied that Paulsen had abused Torske, that his appearance was such as described by Viggo and Raymond Torske. Thus the facts upon which the conclusion of insanity was based were in a large measure vitally conflicting.

The testimony heretofore set out is the testimony of lay witnesses and was sufficient to raise an issue as to defendant's sanity. Nonexpert witnesses who have an intimate personal acquaintance with and an opportunity to observe the actions and demeanor of a person, before, at and after the time in question, may be permitted to testify as to his sanity or insanity when they have stated the primary facts which support their conclusion. *Pflueger v. State*, 46 Neb. 493; *Lamb v. Lynch*, 56 Neb. 135; *Clarke v. Irwin*, 63 Neb. 539; *Snider v. State*, 56 Neb. 309; *Bothwell v. State*, 71 Neb. 747; *Larson v. State*, 92 Neb. 24; *People v. Casey*, 124 Mich. 279; *State v. Neubauer*, 145 Ia. 337. In *In re Estate of Wilson*, 78 Neb. 758, all the earlier cases are discussed, compared, analyzed and harmonized. The reason, says Jones, Commentaries on Evidence (2d ed.) sec. 1267, is based "upon the obvious ground that it is often impossible for witnesses in such cases adequately to describe to the court or jury the actions, looks and symptoms which properly constitute the basis for determining the question." The court or jury are presumed to be as capable of drawing the conclusion from the facts as the nonexpert witness, but such witness is permitted to augment his powers of description and narration by stating his conclusion based upon the

facts and circumstances previously narrated. The value of such opinion depends upon the facts and circumstances upon which it is based and is to be weighed according to its merits, the court or jury reaching their conclusion from the facts narrated and found to be true, which narration is aided by the conclusion of the witness.

Thus, at this stage of the trial, the accused having relied upon insanity as a defense and having offered competent evidence to support it, the burden of proof was upon the state to establish his sanity. *Wright v. People,* 4 Neb. 407; *Prince v. State,* 92 Neb. 490. This rule applies not only to insanity but to any distinct substantive defense which may be interposed by the accused to justify or excuse the act charged. *Gravely v. State,* 38 Neb. 871. To meet the burden cast upon the state by the defense of insanity, two physicians were called to testify as experts. The plaintiff in error contends that in the admission of their testimony the court committed reversible error, in that their opinion was received by the court without requiring them to detail the facts disclosed by their examination and observation of the defendant. The opinion of a medical expert may be based (1) on his acquaintance with the party whose condition is under investigation, (2) upon a medical examination of him which he has made, or (3) upon a hypothetical case stated to the expert in court. *Omaha & R. V. R. Co. v. Brady,* 39 Neb. 27.

There is some confusion among the authorities as to the correct rule relative to the admission of the opinion testimony of experts, but the great weight of authority sustains the rule that ordinarily an expert witness testifying from observation or personal knowledge must testify to the facts upon which the opinion is based. *Hornby v. State Life Ins. Co.,* 106 Neb. 575. The great weight of authority supports this view. *Hathorn v. King,* 8 Mass. 371; *State v. Megorden,* 49 Or. 259; *Flanagan v. State,* 106 Ga. 109. See, also, the note in 20 Ann. Cases, 883, and cases cited to support this proposition as well as those contra, and 11 R. C. L. 577, sec. 9, and cases

cited. In Jones, Commentaries on Evidence (2d ed.) sec. 1333, it is said: "Ordinarily he must first testify to the facts, or such facts must be stated to him hypothetically, so that the jury may be in possession of the requisites to weigh his answer. But it is not always necessary that the question should be hypothetical in form when the opinion of the witness is sought, not upon assumed facts, but upon his personal knowledge or observations. A familiar illustration of this practice is where a physician is called to give his opinion as to the mental or physical condition of one whom he has examined." The same author concludes a discussion of the cases as follows (section 1334): "On the whole, then, notwithstanding the respectable authorities which support the view that the opinion of an expert witness, based upon his own observations, is admissible without a statement of the facts upon which it is based, the better law undoubtedly is with the majority which calls for statement of the facts." Jones cites the opinion of the United States supreme court in *Raub v. Carpenter*, 187 U. S. 159, with the comment that its argument is unanswerable, "that when the witness states a conclusion on facts which he alone knows and does not disclose, an assumption of the existence of facts occurs for which there are no evidentiary foundations."

However, a few cases have held it sufficient to state the extent of his knowledge and give his opinion, leaving its support from the evidential facts to be deduced by a later direct or cross-examination. In *People v. Faber*, 199 N. Y. 256, it was held that an insanity expert who has observed a person may state his opinion without first stating his observed data, but it was also held that "the jury are undoubtedly entitled to the facts on which an insanity expert bases his opinion, if the same are sought by the prosecution or the defendant." This last case cites *People v. Youngs*, 151 N. Y. 210, in which, although stating this as the New York rule, as above, said: "It is undoubtedly the better practice to require the witness to state the circumstances of his examination and the facts,

symptoms or indications upon which his conclusion is based before giving his opinion to the jury."

Wigmore in his work on Evidence (2d ed.) sec. 1927, says: "When an expert witness, testifying from personal observation, gives his opinion as testimony, it is usually necessary to predicate in express terms, hypothetically, the data upon which the opinion is based. The reason is that otherwise the jury would be unable to tell whether his opinion was meant by him to be applied to the facts ultimately found by the jury." It is Wigmore's theory (section 672) that there are two distinct subjects of testimony—premises and inferences—the latter involves a consideration of the former. But the same author criticizes the rule stated above for that the cross-examination will or can expose the weakness of the opinion. He also adds that it is a fallacy where the witness speaks from personal observation. Quoting from the same author (section 1929): "The remedy (whenever one shall be undertaken) ought to be radical. The only purpose for which we need any weapon of the sort is the potential need of saving the time that in some cases might be otherwise taken by marshalling an interminable multitude of opinions, and of preventing the consequent confusion of issues and the possibility of forcing a verdict by mere preponderance of numbers and influential names. But all this is mere possibility; it would not even be feasible in the ordinary case; and, whenever it was feasible, and if it should then be attempted, the ordinary judicial discretion to limit the number of witnesses, and the rule requiring personal knowledge, would quite answer all practical purposes. For this reason there seems to be no objection against taking a radical step, the entire abolition of the rule as such, leaving only in its place some specific discretion in the judge to meet the possibilities above mentioned." Of course, the radical action suggested as necessary would require legislative action, rather than judicial.

The record in this case discloses that the experts testified from personal examination and observation. They

testified that their examinations and observations were such as enabled them to form and express an opinion as to defendant's sanity. They were qualified to testify as expert witnesses. They stated as their opinion that the defendant was sane at the time in question and was able to distinguish between right and wrong with reference to his act. Thereafter they were subjected to a vigorous cross-examination by the defendant which disclosed the facts upon which they based their opinion of the defendant's sanity. The defendant submitted his theory of the evidence to one of them and asked the witness if, assuming the truth of the facts stated by defendant, he was insane at the time he killed Paulsen. In *In re Estate of O'Connor,* 105 Neb. 88, we held: "The value of the testimony of a handwriting expert on the issue of forgery depends largely on the cogency of the reasons for his opinion." This goes to the weight rather than the admissibility of the evidence.

Again, in *In re Estate of Wilson,* 78 Neb. 758, we held that a nonexpert witness qualified by acquaintance, who had occasion to and did observe a party and his condition at the time when his state of mind is in dispute, may testify that in his opinion such person was of sound mind, while the opinion that a person is of unsound mind must be based on facts indicating unsoundness. Let it be remembered that the experts in this case testified that the defendant was sane at the time in question. While we are of the opinion that the recital of facts in this case was sufficient, taking into consideration the direct and cross-examination, nevertheless, following the rule of the above case, they could have testified to the sanity of the defendant without such recital. Quoting from *In re Estate of Wilson, supra:* "This seems to us to be the common sense view. Sanity is the rule and insanity the exception. What facts or circumstances are there that an acquaintance can relate as a foundation for his opinion that a party is of sound mind, except that he has known him for years, has had a close personal acquaintance, and has never observed anything in his speech or

conduct denoting insanity or mental incapacity? On the other hand, the insanity or mental incapacity of a party is indicated by many acts and circumstances which are observed and which can be narrated by those whose opinions are desired, and it is those acts and circumstances alone upon which the nonexpert must rely for his opinion." In *Braunie v. State*, 105 Neb. 355, this court said: "On the question of insanity the testimony of experts was introduced both on behalf of the defendant and also for the state. No hypothetical questions were asked, but these witnesses based their opinions on their examinations of and conversations with the defendant before the time of the trial. The witnesses for the state testified that the defendant was sane. * * * The jury had before it the history of the crime, showing defendant's actions, statements and conduct for a considerable time both before and after the shooting, as well as the testimony of experts that the defendant was sane. There is ample to support the verdict." Since the experts who testified in this case disclosed to the jury the basis of their conclusion, we conclude that the contention of the defendant as to the evidence of the experts on the question of sanity is without merit.

The plaintiff in error urges with considerable insistence that certain instructions were erroneous. The first instruction complained about relates to manslaughter which was included and charged in the information as a lesser crime. The instruction was as follows: "The jury are instructed that if you find from the evidence beyond a reasonable doubt, that, on the 27th day of February, 1931, in Lincoln county, Nebraska, the defendant, Mangnus Torske, without deliberation, premeditation or malice, did unlawfully and feloniously kill Lewis C. Paulsen, with a shotgun, either upon a sudden quarrel or unintentionally, then said Mangnus Torske would be guilty of manslaughter, and your verdict should be, in case of such finding, convict him of such crime." It is urged that the omission of the words, "while the slayer is in the commission of some unlawful act" following the word "unin-

tentionally," was prejudicially erroneous. This instruction is immediately followed by the statutory definition of manslaughter, as follows: "Whoever shall unlawfully kill another without malice, either upon sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter." Comp. St. 1929, sec. 28-403. These instructions were not inconsistent, contradictory, nor confusing to the jury, but, taken together, they correctly state the law. A model instruction should, of course, be as the plaintiff in error contends. But, where instructions, taken together, correctly state the law, the judgment will not be reversed because one does not state the entire law on the subject, unless it appear that the jury were misled. *Bigley v. National Fidelity & Casualty Co.*, 94 Neb. 813; *In re Estate of Lyell*, 116 Neb. 827; *McVey v. State*, 57 Neb. 471.

The evidence in this case is that Torske purposely and maliciously, but without deliberation and premeditation, killed Paulsen. There is evidence of malice in the defendant's testimony. The most favorable view of the evidence toward the defendant does not permit a finding that he was guilty of manslaughter. Where the evidence is insufficient to support a finding of a lesser degree than that charged in the information, it is not error to refuse to give an instruction defining the lesser offense. *Fager v. State*, 49 Neb. 439; *McConnell v. State*, 77 Neb. 773; *Schultz v. State*, 89 Neb. 34. It therefore follows that if an instruction be given which is incorrect as an abstract statement of law, relating to a lesser offense than that charged in the information and which is not supported by any evidence in the record and upon which defendant is acquitted, it is not prejudicial to the defendant and does not constitute reversible error. *Abbott v. State*, 113 Neb. 524. This rule is dictated by reason and common sense as well as by judicial authority. It would be folly to reverse a case and resubmit an issue of fact to the jury, where upon that issue the evidence is insufficient to support a verdict. The courts are more than mere

mills to grind out correct abstract legal principles for purposes of academic disputation, they exist for the primary purpose of the administration of justice.

The other instruction, identified as 13a, for the giving of which we are urged to reverse the judgment and remand the case for another trial relates to the defense of insanity. One of them was an instruction requested by the plaintiff in error. Ordinarily, error cannot be predicated on an instruction given at the request of the complaining party. *Bell v. State,* 114 Neb. 17; *Peterson v. State,* 84 Neb. 76; *In re Estate of Mattingly,* 121 Neb. 90. In the latter case this court held: "It is a sound and salutary principle that a party cannot be heard to complain of an error which he himself has been instrumental in bringing about." See, also, *Missouri P. R. Co. v. Fox,* 60 Neb. 531. Any other rule would be an inducement and incentive to a defendant to mislead the court and invite error for the purpose of taking advantage of it.

Another instruction, No. 13, is said to be ambiguous. It is an instruction as to the defense of insanity. The particular portion of the instruction complained of is that "no form of insanity or uncontrollable impulse is recognized under the laws of this state which does not so affect the mind of the accused as to render him incapable of distinguishing between right and wrong with reference to the act committed." At an early date (1876) this court held that the degree of mental unsoundness to exempt a person from punishment must be such as to create an uncontrollable impulse to do the act charged. If it be insufficient to deprive the accused of ability to distinguish right from wrong, he should be held responsible for the consequences of his acts. *Wright v. People,* 4 Neb. 407. Again, in *Bothwell v. State,* 71 Neb. 747, this court spoke upon the question as follows, quoting from *Schwartz v. State,* 65 Neb. 196: "One who knows abstractly what is right and what is wrong must, at his peril, choose the right and shun the wrong." An irresistible impulse does not exempt one from responsibility for crime, who has the capacity to distinguish right from wrong as to the par-

ticular act. The language quoted from the instruction is a correct statement of the law.

Another complaint of this same instruction is that it ambiguously states the burden of proof on the issue of insanity. The language questioned is: "The law presumes that every person is sane and it is not necessary for the state to introduce evidence of sanity in the first instance. When, however, any evidence has been introduced, tending to prove the insanity of the accused, the burden is then upon the state to establish the fact of the accused's sanity, the same as any other material fact, to be established by the state beyond a reasonable doubt to warrant a conviction." This instruction as it relates to the burden of proof when insanity is interposed as a defense is approved in *Maddox v. State,* 108 Neb. 809, and *Williams v. State,* 115 Neb. 277. We have previously stated in this opinion that the defendant having interposed the defense of insanity and having adduced evidence to support it, the burden of proof was upon the state to establish his sanity. This instruction complies with the rule and the criticism thereof is hypercritical and without merit.

We agree with plaintiff in error that instruction No. 14 ought not to have been given. It sought to elaborate in detail upon the defense of insanity, which had already been explained in previous instructions. Its statements are self-contradictory to such an extent that it does not convey any clear statement of law. True, it was approved in *State v. Brandenberger,* 151 Ia. 197, but without any discussion, and in effect holding it without prejudice, in the case at bar. We disapprove of the instruction, but find that in this case it could not confuse the jury, because under the facts the other instructions to the jury correctly submitted the issues. *Peterson v. State,* 115 Neb. 302. A judgment of conviction will not be reversed for the giving of an erroneous instruction which does not prejudicially affect the rights of the defendant. *Quinton v. State,* 112 Neb. 684; *McArthur v. State,* 60 Neb. 390; *Keeler v. State,* 73 Neb. 441.

In conclusion, we are of the opinion, formed after a careful and exhaustive examination of the record and a study of the excellent briefs filed in this case, that the defendant had a fair trial; that there was no prejudicial error, either in the admission of evidence on the question of insanity or the instructions to the jury by the court; that the defendant was represented by able counsel both at the trial and in the proceeding in error in this court; that there was no miscarriage of justice; and that the judgment ought to be affirmed.

AFFIRMED.