GEORGE SCHRAM, APPELLANT, v. FRANK O. LOWDEN ET AL., APPELLEES.

15 N. W. 2d 42

FILED JUNE 23, 1944. No. 31783.

*Hubka & Hubka,* for appellant.

*Chambers, Holland & Locke* and *Jack & Vette, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

SIMMONS, C. J.

In this action plaintiff sought to recover damages for personal injuries resulting from being struck by the gate on a stock loading platform of the defendants. Trial was had. The jury found for the defendants. Plaintiff appeals. We affirm the judgment of the trial court.

The defendants maintained a yard at their Clatonia station for the use of shippers of livestock. This yard was near a sidetrack, had a chute running from it, inclined upward to a loading platform built alongside the track. The loading platform, parallel with the track, was 16½ feet long and five feet wide. The edge of the platform was about three and one-half feet from the nearer rail and 14 inches from a car on the tracks. The chute was perpendicular to the platform and centered on the side away from the track. Attached to the chute posts at the edge of the platform were two swinging, slatted gates, of heavy timber, about five feet wide and five feet high. One of these gates, referred to here as the east gate, had an extension which made the gate five and one-half feet wide when closed. The west gate did not have such an extension at the time of the accident. Each gate was equipped with iron "holder" rods, so placed that when raised they did not interfere with the free movement of the gates and when lowered they locked the gates in position. These gates had a 180 degree arc, and, when extended at right angles to the platform, extended a few inches beyond the loading platform. The extension wing was so made that when extended it would fit against a car being loaded or unloaded. There also was a removable wooden "apron" used to floor the space between the

platform and a car being loaded or unloaded. When in place for the loading or unloading of a car, the gates, the apron, the platform and the chute made a runway from the pens to the car.

The yards were used largely by one William Heller for the shipment of stock. To the west of the yards about 150 feet was a highway crossing, and still beyond was an elevator served by the same sidetrack as the stockyard.

On October 27, 1942, William Heller was preparing to ship a load of hogs. Plaintiff, a man 77 years of age, and about five feet, four inches tall, a relative of Heller's by marriage, was asked to assist. A car was spotted at the platform. Plaintiff, at Heller's direction, went upon the platform into the car, bedded down the car with straw and assisted in the selection of hogs to be shipped. Heller sent plaintiff to the station of defendants to order another car. Heller loaded the car. Plaintiff then went to Heller's home to bring a lunch to Heller. Heller closed the car, removed the apron and placed it between the two gates. The extension wing was pushed back into the main gate. The holder rods were not used to fasten the gates in position. The gates were left standing, with the extension pushed back, at about right angles to the front end of the platform, so that the gates may have extended over the edge of the platform, and with a clearance space of several inches between the car and the gates.

An empty car stood east of the loaded car with a space of about 40 feet between the two cars. Shortly after noon, Heller had a truck preparing to move the loaded car and spot the empty car. An engine of the defendants moved into the side track to pick up the loaded hog car, to get a load of grain at the elevator, and to spot an empty car for loading. They instructed the truck driver to move and he did move out of the way.

Stairsteps led up to the platform from the west. Heller instructed plaintiff to go upon the platform and watch the movement of the hogs in the car when the engine coupled on and moved the car, and to see that the second car was spotted properly. Plaintiff went upon the platform.

Up to this point there is no material dispute in the testimony. Plaintiff testified that he went upon the platform and stood with one hand on the west gate and the other on the car in a position where he could see around the gates and into the inside of the east end of the loaded car. He looked up, saw the engine coming down the sidetrack at a high rate of speed (fixed by another witness at ten to 15 miles an hour), and the engine swaying from side to side, gaining speed; and that it made no stop either for the empty car or to couple on the loaded car. He saw defendants' employees looking at him. He turned to run off the platform to safety, heard the contact of cars coming together, then a crash. He was knocked to the ground and seriously injured. Plaintiff further offered evidence that the cars were painted red, the engine black, and that following the accident there was a gouge in the extension section of the east gate, near the bottom, leaving a black mark. Plaintiff's evidence also was that there was no wind at the time. Plaintiff's theory was that the engine struck the east extension gate, pushed it against the apron and against the west gate, causing that gate to hit the plaintiff.

Defendants offered evidence that the engine moved into the siding, stopped east of the stockyard and cars to remove a derail appliance, then moved toward the stockyard at from two to four miles an hour, stopped to couple onto the empty car, then moved to the loaded car, stopped to couple onto it, and then moved to the elevator to get the grain car. The brakeman making these connections was working on the side of the train away from the platform. As the engine approached the yards, the gates were observed to be in a position allowing ample space to clear the movement of the car and engine. The plaintiff was not seen to be on the platform. After observing that condition, the fireman (on the side next to the stockyard) was observing conditions at the crossing. The train moved down to the elevator (about 600 feet from the yards), got the grain car and was returning toward the stockyard, when a man or men were observed running toward the plaintiff, and for the first time

defendants' employees knew that an accident had happened. Defendants offered evidence that there was a strong wind blowing that day from the northwest, and that there were no marks on either the gate or the engine. The gates were farther to the west after the accident. There also was evidence that the wind and its effect on the gates were discussed right after the accident in plaintiff's presence and hearing.

Plaintiff alleged negligence of the defendants in nine particulars, in that they did not keep a proper lookout; did not give any warning; could have avoided injuring plaintiff had they kept a proper lookout; failed to note the condition of the gates, and had they done so could have stopped the engine and avoided the accident; failed to use any care to avoid hitting the gates; caused the engine to travel at a high rate of speed at the time it hit the gates and should have known that the plaintiff was on the platform; failed to discover plaintiff on the platform; failed to notify plaintiff that they were going to proceed to the elevator; and that the gate construction was unsafe.

Defendants, answering, alleged plaintiff's negligence in going upon the platform knowing that the cars were to be moved, and when he knew or should have known that plaintiff and his fellow workers had not fastened the gates to prevent their swinging into the side of the train; that plaintiff knew or should have known that the fastenings of the gates had not been properly adjusted and nevertheless placed himself in a hidden position behind the gates and remained there when the gates swung into the train; and that plaintiff's negligence was gross and proximately caused and contributed to the accident and injury.

Two of plaintiff's allegations of negligence were "(h) That defendant's employees and servants failed and neglected to inform and give plaintiff notice that train was backing past the usual spotting place of stock cars and that engine would continue backing to the elevator in said yard" and "(i) Defendants permitted gates to be so constructed as to extend past south edge of platform, which condition

exposed danger to the plaintiff and caused premises to be unsafe." The trial court did not submit these allegations of negligence to the jury. Plaintiff assigns that as error. As to paragraph (h), without determining whether or not defendants had a duty so to advise plaintiff, it is patent that plaintiff had that information. He knew the engine was coming in to move the loaded car and spot the empty one. He knew the cars were to be moved. He knew these had to be moved either forward or backward. He went upon the platform and close to the car to observe the effect of that movement on the hogs in the car. He, according to his testimony, anticipated a possible rough handling. The distance of the movement, after it began, does not seem to be material. As to paragraph (i), there is no evidence that there was a faulty or dangerous construction of the gates. The evidence is that the gates were properly constructed for the purpose intended. We see no merit in this assignment.

Plaintiff, contending that the trial court in five different instructions submitted the issue of contributory negligence to the jury, argues that there was no evidence of contributory negligence and, hence, these instructions were erroneous. The trial court rightly submitted that issue. The evidence would sustain a jury finding that the plaintiff went upon the platform when he knew or should have known that the gates were unfastened, extending out toward the track and loaded car, and would swing toward him if force were applied to them from the opposite side; that he assumed a largely hidden position behind the gates in relation to the approaching engine, placed himself near the gates and the loaded car, and there awaited the coming of the engine and the moving of the cars; and that he knew or should have known that if force were applied to the gates, injury might follow. We see no merit in this assignment.

Plaintiff contends that by several instructions given, the jury were in effect told that if they found Heller negligent in not fastening the gates, they then must find for the defendants, even though defendants' negligence also was a

proximate cause of the injury; that the jury were in effect instructed to find that the defendants' negligence was the sole cause of the accident before plaintiff could recover; that undue emphasis was placed upon defendants' evidence and theory of the case; and that the trial court in one instruction erroneously assumed certain facts to be supported by the evidence. Plaintiff further complains that the court should have given two tendered instructions to "offset" the claimed error in the instructions as given.

The trial court instructed the jury that it had not attempted to state all the law in one instruction, and that any single instruction must be considered in connection with all the other instructions and to "consider them in harmony with each other." We have examined the criticized instructions and, when taken as a whole, together with other instructions given, find no basis for a claim that the jury were misled or that prejudicial error occurred. The rule is: "Where instructions are not inconsistent or contradictory but, considered together, correctly state the law, the judgment will not be reversed because one does not state the entire law on the subject, unless it appear that the jury were misled." *Torske v. State*, 123 Neb. 161, 242 N. W. 408.

The judgment of the district court is affirmed.

AFFIRMED.