HENRY E. BARTLETT V. STATE OF NEBRASKA.

FILED JANUARY 13, 1927. No. 25287.

1. **Criminal Law:** EVIDENCE OF ATTEMPT TO ESCAPE. Evidence in a criminal case tending to prove that the accused attempted to escape from peace officers is relevant and may be considered by the jury as tending to show consciousness of guilt.

2. ————: FELONY: PROOF. Where a person is charged with the commission of a felony, a conviction may rest on the uncorroborated evidence of an accomplice, when, considered with all the testimony, it satisfies the jury beyond a reasonable doubt of the guilt of the accused.

3. **Homicide:** SUFFICIENCY OF EVIDENCE. In a criminal case, where it is sought "to make the act of killing murder in the first degree, it is only necessary to establish that it was done with deliberation and premeditation, of which there being some evidence before the jury, their verdict fixing that as the degree of criminality is conclusive on that point." *Schlencker v. State,* 9 Neb. 241.

4. **Criminal Law:** WITNESSES: CREDIBILITY: WEIGHT OF EVIDENCE. "In criminal cases, as in civil, the credibility of witnesses and the weight to be given their testimony are matters for the determination of the jury. It is for the jury to determine whether it is convinced beyond a reasonable doubt of the defendant's guilt, not for the reviewing court to say whether it is so convinced. A reviewing court can only inquire whether the evidence was sufficient to warrant the jury in finding the defendant guilty." *Carleton v. State,* 43 Neb. 373.

5. ————: EVIDENCE OF CONDUCT OF ACCUSED. It is proper to admit evidence in respect of the conduct of an accused person while under arrest or in jail awaiting trial. *King v. State,* 108 Neb. 428.

ERROR to the district court for Kearney county: WILLIAM A. DILWORTH, JUDGE. Affirmed.

*Adams & Zimmerman* and *Herman Ginsburg* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *George W. Ayres, contra.*

Heard before ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DEAN, J.

Henry E. Bartlett was informed against, tried and convicted of having murdered Asa Ransom in Kearney county. The jury brought in a verdict of first degree murder and imposed the death penalty. A new trial was denied. Thereupon the court sentenced defendant to suffer death by electrocution. Alleging error, defendant's counsel have brought the record here for review.

The state submitted evidence which discloses substantially the following material facts: Soon after midnight, in the very early morning of October 19, 1924, some person, then unknown, burglariously broke and entered a Minden hardware store. Asa Ransom, aged 44, was then chief of police of Minden. Within about an hour after the burglary was discovered, officer Ransom and John Peterson, a young man of 28, left Minden in Peterson's car in search of the burglar. They drove out about 12 miles east of Minden and, finding no trace of a suspect, they faced about, and on their return, while yet about 4 miles from Minden, they met two men, strangers to both, driving east in a Ford sedan. When the cars met they stopped and stood front to front and about 20 feet apart. Both cars, under the rule of the road, were on the wrong side of the highway. Peterson testified that as soon as his car stopped Ransom got out and walked directly to the north door of the sedan carrying a flash light and a revolver. Almost immediately, the evidence discloses, two shots were fired from out of

the north side of the sedan, where Ransom stood, and from one of these he received his death wound. One of the witnesses testified that the shooting began in 20 seconds after Ransom came up to the sedan, the other that it began in about a minute. Peterson then immediately got out of his car, and Ransom, though mortally wounded, ran back to the Peterson car shooting at the sedan as it drove away to the east. Peterson had with him "an automatic shotgun and an automatic rifle, * * * a very efficient firearm, and very high power," and he testified that he joined Ransom in the shooting and fired the contents of his gun at the receding car. In respect of a statement by Ransom, Peterson testified: "Q. What did Ransom say, if anything, to you? * * * He says, 'They got me; you go and get them. * * * Leave me and go and get those other fellows.'" These were Ransom's last words. In about two minutes he sank to the ground and died. In this connection it may here be observed that, on Peterson's cross-examination, it was developed that Ransom, while he stood at the north door of the sedan, held his gun "down by his side," and that the man in the sedan, "sitting next to the driver," immediately after Ransom was shot, turned and fired at him, Peterson, from the south door of the sedan "at least five times" before the car moved away, and that the overcoat which he then wore, which is in evidence, was perforated by some of the bullets. A physician testified that, upon examination of Ransom's wound, in the region of the heart, in his opinion, he might have lived one or two minutes after he was shot.

A diligent search by citizens and by state and county peace officers was at once begun for a clue that would lead to the arrest of Ransom's slayer. But it was not until about six months after Ransom's death, namely, on April 22, 1925, that Henry E. Bartlett, the defendant here, and Charles Sealing, implicated with him, were arrested. Sealing first gave the information which led to the arrests. When arrested Bartlett was 35 and he and his family then lived at Kearney, where he was employed by a firm which

dealt in memorial tablets and the like. For his defense Bartlett interposed and relied on an alleged alibi. Sealing was 27 when the arrests were made. He and his family lived at Hastings, where he was a business college student. Sealing turned state's evidence.

Bartlett and Sealing became acquainted about four or five years before the homicide. Sealing testified that his evidence was voluntarily given and without any promise of immunity. He is not a party to this action. From Sealing's evidence the record discloses substantially the following material facts. And in part it corroborates the material evidence submitted by Peterson on the part of the state. Sealing testified that on October 18, 1924, Bartlett ate supper with him and his family at their Hastings home at about 6 o'clock.

In respect of their subsequent movements that night Sealing testified: "Q. Did you leave in a car for any place? A. Yes, sir. Q. Whose car? A. Mine. * * * Q. Which way did you go after you left Hastings? A. West. Q. Did he (Bartlett) say anything after you left Hastings about where he wanted to go? A. He said, 'Let's go to Minden. I have a shotgun spotted there that I want to get.'" Sealing admitted that he knew Bartlett intended to steal the gun. And he admitted that he took a revolver along, which he carried in a holster, because Bartlett advised: "You might get in trouble with me because I am pretty well known." But he testified that, unknown to Bartlett, his revolver was not loaded. About midnight, at Minden, Bartlett said to Sealing: "I am going to get the gun and we will go home." It was about this hour that the crash of breaking glass, in the rear of a Minden hardware store, attracted the attention of the police officers. Sealing suspected this crash was occasioned by Bartlett, but he held his peace. The night watch, however, finding Sealing near-by, arrested him and imprisoned him in the city jail, to be held for investigation. Sealing made no resistance. Bartlett evaded arrest and shortly came up to the jail and, finding Sealing inside, he shot the lock off the jail door and both men hasti-

ly left town in Sealing's car. The jail, called a "calaboose," was a flimsy structure and was ill adapted for its intended purpose. Hence, the escape was easily made.

Sealing's story of the ill-fated midnight venture in part, as above noted, corroborates that of Peterson. He testified that, as they travelled east from Minden, he drove the sedan and Bartlett sat at his right, and when the cars met, Ransom stepped up to the Sealing car and, upholding his gun and holding a flash light in their faces he said: "You are the birds we want." According to Sealing the shooting by defendant began in about 20 seconds. Upon further inquiry Sealing testified: "Q. Who fired the shots from your car? A. Henry E. Bartlett. Q. Then what did you do immediately after the shooting? A. Started to drive. Q. Were there any shots fired after your car started? A. There was. Q. Who by? A. Some man behind us. * * * Q. After you got some distance east from where the shooting occurred, what did Bartlett say? A. The first thing he said, 'Drive as fast as you can; they are shooting at us.' * * * Q. What did he say about himself? A. After we had gone probably a half mile further than that he said, 'I never told you this before, but,' he said, 'I have done time before twice, and I am wanted now, and if they get me I am in for it.' " And that Bartlett also said: "I fired two shots to the left (north) first, and emptied my gun to the right." This evidence tends to support the state's argument that one of the two shots that Bartlett "fired * * * to the left" was the shot that killed Ransom, and that it was when he "emptied" his "gun to the right" that Peterson's overcoat, as Peterson testified, was perforated by the bullets that came from that direction. And these were all, of course, questions of fact for the jury.

As they drove rapidly away from the scene of the tragedy, Bartlett complained two times to Sealing that he had been shot in the back and, both times, at Bartlett's urgent request, he examined Bartlett's person, but failed to locate the "bullet," or the "shot," or the "missile" that Bartlett persistently protested was embedded in his flesh. But the

state, upon obtaining this information, procured an X-ray picture of Bartlett's back to be taken, while he was in custody, by a practicing physician who was an X-ray operator. This physician testified that, in the lower back part of Bartlett's body, the X-ray plate, which is in evidence, revealed certain small, irregularly shaped foreign bodies of metallic type of either lead or steel, and that several smaller fragments were also imbedded in the soft tissue. And besides, the state sheriff found "holes in the back of the (front) seat" of Sealing's car and he "took a piece of lead" therefrom. This bit of lead is a battered fragment of a leaden bullet. And Sealing's car was so badly dented with bullets that, to avoid embarrassing inquiries, he testified that he filled the bullet holes and covered the filling with paint. From whence, then, came the diminutive bodies of metallic type, the leaden slivers, that were embedded in Bartlett's back? Clearly it was for the jury to determine what relation, if any, the furious fusillade of bullets from Ransom's gun and Peterson's "very high power" automatic rifle that followed the fleeing sedan that fateful night bore to the shot or to the diminutive particles of lead and steel in Bartlett's person of which he made complaint to Sealing.

So well did the participants in this crime succeed in eluding discovery that it was about six months before an arrest was made. And when Bartlet was arrested he was working in the stonecutters' yard of his employer at Kearney. An officer approached and asked him if his name was Bartlett. Defendant denied his identity and, pointing to another workman at some distance away, he said: "That man is Bartlett." Upon discovering his ruse one of the officers said: "You are Mr. Bartlett, and we are officers, and we want you." Bartlett again denied his identity and attempted to escape, but, after a strenuous struggle with the officers, he was subdued and taken in a car to his own home near-by. Evidence that the accused attempted to escape from peace officers is relevant and may be considered by the jury as tending to show consciousness of guilt. 16 C. J. 554, sec. 1073. Upon arrival at defendant's home

Bartlett v. State.

Bartlett told his wife to let no one talk to the children. The officers, having first obtained a search warrant, found in Bartlett's house a "38 Colt's automatic" gun, and another firearm and a supply of bullets, and some 38-calibre loaded shells. And some empty 38-calibre shells were found in the highway at the scene of the murder. An empty 38-calibre shell, and also the broken lock, were both found at the prison door where the lock was shot away. These exhibits were not alone, of course, conclusive as against defendant, but they were properly for consideration by the jury.

In his attempt to establish an alibi, Barlett professed the utmost ignorance of all that had to do with the murder of Asa Ransom. He admitted that he ate supper at Sealing's home the evening of October 18, and testified that he left there after the evening meal and was at his own home at Kearney, with his family, from about 9 o'clock that night until early in the following forenoon. And to support his evidence he called his wife, and an aged aunt, who testified that she was at defendant's home that night. And other relatives, a sister and her husband, testified that they met Bartlett at the home of a friend, or a relative, in the forenoon of Sunday, October 19, and that neither in his movements nor in a word that he said was there anything to indicate that he had been shot, nor to indicate that slivers from bullets had been embedded in his body. Of course, it may be presumed, and naturally so, that Bartlett's wife and his sister, and the other relatives who testified in his behalf, were vitally interested in the outcome of the trial. But it may be recalled that almost a year elapsed between the date of the homicide and defendant's trial, and this may, in part, in view of all the incriminating evidence, have caused the jury to believe that these witnesses had in mind facts pertaining to a different date than that to which they testified. The defendant also introduced evidence in an unsuccessful attempt to convince the jury that an under-sized tramp, who limped as he walked, was Sealing's companion on the night of October 18, instead of Bartlett. And a vain effort was also made to convince the jury that a

young man of 19 was "with Sealing * * * that night" at the scene of the murder, and that Sealing "fired the fatal shot." But the evidence of the witnesses who saw and talked with Sealing, when he was imprisoned in the Minden jail, disclosed that the man who was seen with Sealing that night resembled Bartlett in size and general appearance.

An application for a change of venue was denied the defendant and this is assigned as reversible error. But defendant admits in the brief that, in view of the "affidavits made and filed" in support of their application, they "could hardly insist upon a change of venue or that the court erred in not granting it." We do not think the court erred in denying a change of venue.

It is contended that the court erred in giving the following instruction: "You are instructed that, while it is a rule of law that a person accused of crime may be convicted upon the testimony of an accomplice or accomplices, still a jury should always act upon such testimony with great care and caution, and subject it to careful examination, in the light of all the other evidence in the case, and the jury ought not to convict upon such testimony alone, unless after a careful examination of such testimony they are satisfied beyond a reasonable doubt of its truth and that they can safely rely upon it." But this instruction was given to the jury in *Lamb v. State*, 40 Neb. 312, and we there held, in an opinion by Norval, C. J.: "A conviction may rest on the uncorroborated evidence of an accomplice, when, considered with all the testimony, it satisfies the jury beyond a reasonable doubt of the guilt of the accused." We adhere to the rule announced in the *Lamb* case and hold that it is applicable here. *Hutter v. State*, 105 Neb. 601.

We do not agree with counsel's contention that in no event should a verdict have been returned for punishment in excess of life imprisonment. The argument is that premeditation was not shown. Clearly the argument is not based on the evidence. Premeditation clearly appears. Defendant not only armed himself that he might be prepared

for any resistance that might be encountered, but he also told Sealing to bring his revolver along, as noted above, because he, Bartlett, was "pretty well known," and, hence, there might be trouble. We think the evidence of premeditation and deliberation was sufficient to be submitted to the jury and that it sustains the verdict. *Schlencker v. State*, 9 Neb. 241; *Carleton v. State*, 43 Neb. 373.

As tending to show the type or character of the defendant, the record discloses that, some time after his arrest, for safe-keeping, Bartlett was taken from the Minden jail to the state penitentiary there to await his coming trial at Minden. In his direct examination the fact was developed that, while so confined there, he joined with two convicts, who were in the penitentiary awaiting execution for murder, in an attempt to effect an escape. These three occupied adjoining cells. In respect of this attempt at jail-breaking Henry Tiehen, a cell-house night guard, testified that on a certain evening when he was about to lock the prisoners in their cells he discovered that one of the cell doors "was left open just a little bit;" that when he entered the end cell, which was Bartlett's, two convicts and Bartlett "all grabbed ahold of me. * * * And Bartlett stood guard over me with a pair of scissors raised up like that (indicating)." The three men then threw Tiehen into one of the cells and, he continued: "They proceeded to tie me up; tied my legs with wire and my hands, and gagged me with some rags and stuffed rags in my mouth, and then tied a rag around my head. * * * Q. After you were down on the floor, what, if anything, did Bartlett say to you? A. 'Well,' he says,—'now, * * * keep quiet, * * * by keeping quiet,' he says, 'you can save your life.' He says, 'That is what we are trying to do, is save ourselves.' Q. Where did he have the scissors? A. Well, he held them over me. He was a kind of a guard over me, and threatening me with the scissors." One of the convicts "had a short, pointed knife that he tried to use. Well, he didn't use it, but he held it up on me. Bartlett says that he hated to kill me on

account of having a family, and if I kept quiet it wouldn't be any use." The evidence, in respect of this attempt to break jail, it will be recalled, was introduced by Bartlett in his direct examination.

Bartlett further testified in his direct examination that, when he was taken from the penitentiary to Minden for trial, a knife was found in his trousers pocket. This exhibit is a made-over and somewhat shortened case knife which was ground to a keen-cutting edge and sharpened to a dagger point. And on his cross-examination he admitted that he joined in the attack on the night watchman, Tiehen, and corroborated Tiehen's evidence in part, in an admission that he stood guard over Tiehen in a "threatening attitude." These admissions, when considered with all of the submitted evidence, were properly submitted to the jury. It follows that reversible error was not committed in receiving the knife in evidence over defendant's exception. And we have held that it is proper to admit evidence in respect of the conduct of an accused person while in jail awaiting trial. *King v. State*, 108 Neb. 428. See, also, 16 C. J. 554, sec. 1071; *State v. Clark*, 166 Ia. 123.

"In criminal cases, as in civil, the credibility of witnesses and the weight to be given their testimony are matters for the determination of the jury. It is for the jury to determine whether it is convinced beyond a reasonable doubt of the defendant's guilt, not for the reviewing court to say whether it is so convinced. A reviewing court can only inquire whether the evidence was sufficient to warrant the jury in finding the defendant guilty." *Carleton v. State*, 43 Neb. 373.

We have examined all the assignments of alleged error to which our attention has been directed by defendant, but we do not find it necessary to discuss such assignments further than we have already done. Reversible error has not been pointed out by counsel for defendant. It follows that the judgment of the district court must be and it hereby is in all things affirmed. Friday, April 29, in the year

of our Lord, 1927, between the hours of sunrise and sunset
is the day and the hour in which it is ordered that the sen-
tence of the district court shall be carried into effect.

AFFIRMED.