CHARLES R. STARKWEATHER, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

73 N. W. 2d 619

Filed December 19, 1958. No. 34498.

*T. Clement Gaughan* and *William F. Matschullat,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Cecil S. Brubaker,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and BOSLAUGH, JJ.

SIMMONS, C. J.

By information, the plaintiff in error was charged in one count with unlawfully, feloniously, purposely, and of his own deliberate and premeditated malice killing Robert William Jensen; and in a second count with unlawfully, feloniously, and purposely in the perpetration of a robbery killing Robert William Jensen.

We herein refer to the plaintiff in error as the defendant, and to the defendant in error as the State.

Defendant pleaded not guilty, and not guilty by reason of insanity to both counts.

Trial was had to a jury. The jury found the defendant guilty of murder in the first degree on counts I and II and fixed the penalty at death.

A motion for a new trial was made and overruled. Sentence was pronounced in accord with the verdict.

The defendant's assignments of error here are:

"1. The Court erred in refusing to give Instruction No. 6 requested by the defendant and by restricting the jury's consideration to the defendant's feebleness of mind or will in determining whether the homicide had been committed with a deliberate and premeditated design to kill, thus preventing the jury from considering whether the defendant was suffering from such insanity or impairment of the mind that would, if present, eliminate capital punishment from the sentence for the perpetration of a homicide.

"2. The Court erred in refusing to give Instruction No. 10 requested by the defendant.

"3. The verdict is contrary to the evidence."

We affirm the judgment of the trial court.

The third assignment of error is that the verdict is contrary to the evidence. We determine that assignment first. The contention is that the evidence is insufficient to establish the existence of deliberation and premeditation as essential elements to the crime of murder in the first degree. Here the defendant would have us reject all of the State's evidence and material parts of evidence of defendant's witnesses going to that issue.

As the case developed, it became evident that the ultimate issue of fact for the jury to decide was the mental competency of the defendant in the above respects. The assignment of error goes to those questions.

Defendant was 19 years old. He had been keeping company for about a year and a half with a 14-year-old girl named Caril Fugate. It becomes necessary to

mention her from time to time in this recital. We refer to her as Caril.

After the commission of the offenses here involved, defendant gave the State a series of signed confessions. They are in evidence, in large part offered by the defendant. The State did not introduce evidence as to the other killings hereinafter recited. That evidence came from the lips of the defendant and from his confessions which he offered. The recital of facts here contained comes from those sources, reinforced by circumstances and evidence otherwise.

We begin at the home of Caril. She lived in Lincoln with her stepfather, mother, and baby half sister. On the afternoon of January 21, 1958, defendant there killed the stepfather, mother, and half sister. The evidence does not preclude a finding of deliberation and premeditation in the killing of the stepfather. Defendant wrapped the bodies in paper, rugs, and blankets, each separately. He deposited the body of the mother and baby in an unused outhouse, and the stepfather's body in a chicken house.

Whether Caril was present then is denied in one confession and affirmed in another. Defendant and Caril lived in the house until January 27, 1958. Relatives and others repeatedly came to the house seeking information about defendant and the other three persons. Caril, using excuses, turned them away.

On the morning of January 27, 1958, some of them left with a statement that they were coming back with the police. Defendant and Caril then decided to flee, and did so shortly before noon in defendant's car. Among other things, defendant took with him a .410 gauge shotgun belonging to the stepfather, a revolver (for which he had no ammunition), and a hunting knife. Before leaving defendant had sawed off a part of the shotgun barrel to cause it to "spread." They changed a tire and bought gasoline in Lincoln. They drove south about 8 miles to a filling station on the

highway where they bought gasoline, had a tire repaired, and bought food and ammunition for the shotgun and a .22 gauge rifle, although defendant did not then have such a rifle. They also got Kansas, Missouri, and Nebraska road maps. Defendant then drove south, east, north, and then east through the town of Bennet to a farm where a Mr. Meyer lived alone. Defendant had hunted there. Near the Meyer home was an abandoned schoolhouse site. All buildings had been torn down. A cave remained with the door torn from its hinges. During the afternoon defendant and Caril visited the cave near the Meyer house. Later defendant shot and killed Mr. Meyer and robbed him of money, some articles of clothing, and a .22 gauge rifle. They again visited the cave.

Defendant then again drove to the filling station south of Lincoln where he bought more ammunition, secured more maps, returned to Bennet, and went back to the Meyer farm. He became fearful that some one had been there and discovered that crime. They then started away from the Meyer farm and schoolhouse vicinity. Defendant's car became stuck in the snow and finally was abandoned.

Carrying the guns, the knife, and other articles defendant and Caril then started walking along the road. They met up with a young man named Robert Jensen and a Miss King from Bennet who were riding in an automobile. Defendant asked for "a lift into Bennet," and Jensen offered them a ride. Defendant stated that Jensen recognized him, basing it upon questions asked by Jensen.

Defendant and Caril were in the rear seat, each with one of the guns in their hands. Defendant ordered Jensen to drive to Bennet, which he did. He then ordered him to drive toward Lincoln, which he did. After going a few miles defendant ordered Jensen to turn around and drive back to the schoolhouse cave location, which Jensen did. During this drive defendant

robbed Jensen of his money and told him he was going to take the Jensen car.

When they got to the cave site, Jensen and Miss King were ordered out of the car and told to go into the cave. Jensen started down, turned, and was coming out when defendant shot and killed him. The bullets all entered the right side of the head near the ear. Jensen fell head forward into the cave, his body resting in part on the steps. Miss King screamed. Defendant then shot her and shoved her body into the cave.

Defendant remained there for some time. Before leaving he placed the door over the opening to the cave and covered it otherwise with boards and rubbish.

Defendant and Caril left in Jensen's car. They drove toward Hastings, then returned to Lincoln where they slept the remaining early morning hours in the car. On the early forenoon defendant drove into the Ward home yard and gained admission to the home. Mrs. Ward and a maid, Miss Fencil, were present. Defendant took control of the house. Caril came in later. Shortly after noon defendant said Mrs. Ward tried to shoot him and fled. He threw the knife at her, where it struck her in the back. She died from that wound. Mr. Ward returned home. Defendant shot and killed him. Later Miss Fencil was tied up on a bed. She was also killed. Defendant does not admit that killing. Defendant then left the Jensen car in the Ward garage. He took food, clothing, and money from the Ward home. Defendant undertook to dye his hair black by the use of shoe polish.

In the Ward car defendant and Caril then drove from Lincoln to Grand Island to Alliance and on into Wyoming. About noon near the city of Douglas, Wyoming, defendant sought to secure a different car. He shot and killed the owner. Officers appeared. Defendant, alone, fled in the Ward car and shortly thereafter was captured.

From this recital it is quite apparent that the jury

could properly find that defendant intended to rob Jensen and did rob him. It is also quite apparent that the jury could properly find that beginning at least at the time Jensen was ordered to turn and drive back toward the cave, defendant deliberated and premeditated the murder which occurred there. The jury could properly find that what the defendant did do, he could do.

Defendant offered evidence, from many sources, that he was constantly in trouble in school and in fights with his classmates, and that he was quick tempered. Defendant's witnesses classed his intelligence at a dull normal. He is small of size and is nearsighted, a defect that does not appear to have been discovered until the last few years. Glasses were fitted and the handicap largely corrected. Defendant left school at the end of the ninth grade, and worked as a common laborer with apparent ability to retain jobs that he was suited to do. He liked guns, knives, and cars. He owned or had access to guns. He owned the knife involved, and had owned two or more cars.

Defendant offered expert witnesses in psychology and psychiatry. These witnesses testified after they had visited with defendant at length and had knowledge of his confessions and other available information about him. The effect of the testimony of one witness was that defendant was not able to premeditate any of these crimes; that he was not capable of premeditating or deliberating such an act; that he was not mentally capable of premeditating a robbery; that defendant had the mental ability to plan to avoid detection and to saw off the shotgun barrel; that he did not have the capacity to plan a robbery so far as premeditation was concerned; that he had the mental capacity to execute a robbery and to purchase ammunition and gasoline, to pick up road maps, and to get tires repaired; and that he had no capacity for normal control.

A psychiatrist, testifying for the defense, concluded

that defendant did not have the mental capacity to deliberate and premeditate the killing of Jensen; that he did not, could not, premeditate the robbery; that he was mentally capable of forming the intent to commit the robbery; and that right and wrong does not mean to the defendant what it does to an ordinary person as applied to murder. His major finding was that defendant did not think, act, or feel like other people, and there was a possibility that there was something wrong in his brain.

Another psychiatrist testified that defendant was not of a normally healthy mind; that he had a diseased or sick mind; that his mind went directly from impulse to action without any chance for deliberation or hesitation; that he was not capable of premeditation or deliberation; that "in the sense of if we think of premeditation and deliberation as considering an act, its possible consequences, various alternatives, that he was not capable of that; in the sense of proceeding from an impulse to an action, in which the action is broken down into separate stages, it is possible that he did that. * * * I believe when he decides to do something, he goes ahead and does it. He may plan it; it may be an act which takes a certain amount of time, requires certain stages. In taking his car, he has to think, 'Well, where can we stop and let them off?' This is part of the planning. I don't think he thinks of all these things at once, but as he goes along he thinks of what he has to do next in order to accomplish his intent"; that defendant calculated "to avoid detection, to escape, and so on"; and that he formed an intent to rob Jensen, acted on it, and executed it.

The State in rebuttal offered the evidence of three witnesses. A clinical psychologist testified as to his examination of the defendant; that he was of average intelligence, was emotionally immature, and was legally sane.

A neuropsychiatrist testified as to his examination

of the defendant; that he was legally sane; that he knew the difference between right and wrong and the nature and quality of his acts; that defendant had a personality disorder which is "a type of personality that is other than an entirely normal adult personality, or even different from a person, say, nineteen years of age. It has certain variations from what is accepted as the range of standard behavior"; that he had no mental disease or defective mind; and that he was not a fit subject for commitment to a mental institution.

Another psychiatrist testified that psychiatry meant the diagnosis and treatment of nervous and mental diseases. He testified as to his examination of defendant; that he found no evidence of brain disease; that defendant was not suffering from any type of psychotic disorder; that his diagnosis of defendant was that he "had a personality disorder characterized by emotional instability, considerable emotional insecurity, and impulsiveness; that this would fit into a category under the antisocial type of personality disorder; that he was legally sane"; that he did not find any indication of brain damage; that defendant knew the difference between right and wrong and had the mental ability to know the nature and quality of his acts; that he had normal intelligence; that he was medically sane; that he had the mental capacity to form the intent to rob Jensen and to carry out that intent; and that he had the mental capacity to deliberate and premeditate the intent to murder Jensen and to carry out that intention.

All of these witnesses were examined and cross-examined as to their qualifications, their information of the offenses, their knowledge of the defendant, and the facts and scientific basis for their conclusions. No question of foundation is presented. We can here only set out the broad area of the choice that was put to the jury. It is patent that its verdict is amply sustained by the evidence.

The long established and often followed rules are:

"And in addition to being unlawful and malicious, to make the act of killing murder in the first degree, it is only necessary to establish that it was done with deliberation and premeditation, of which there being some evidence before the jury, their verdict fixing that as the degree of criminality is conclusive on that point." Schlencker v. State, 9 Neb. 241, 1 N. W. 857. (This case was reversed and remanded for reasons not involved in the above rule of law. See 9 Neb. 300, 2 N. W. 710. However, it has been cited as authority for the above-quoted rule in Bartlett v. State, 115 Neb. 148, 211 N. W. 994.)

"The credibility of witnesses and the weight of the evidence are for the jury to determine in a criminal case in which the evidence presents an issue of fact as to the guilt or innocence of the accused and the conclusion of the jury may not be disturbed by this court unless it is clearly wrong." Sedlacek v. State, 166 Neb. 736, 90 N. W. 2d 340.

Defendant's requested instruction No. 6 is as follows: "You are instructed that although you find, beyond a reasonable doubt, that defendant was capable of knowing the nature and quality of his act and of distinguishing between right and wrong with respect to the killing of Robert William Jensen, nevertheless, if you should further find that at the time of the killing of said Robert William Jensen by the defendant, said defendant did not then have the mental capacity or ability to deliberate and premeditate said killing, said defendant, in that event, would not be guilty of murder in the first degree." Defendant considers this requested instruction in relationship to an instruction given to which we shall refer presently.

The court instructed the jury that "the burden is upon the State to prove beyond a reasonable doubt each and every one of the elements necessary for a conviction, together with the defendant's sanity."

The court further instructed the jury that it could

find the defendant guilty, under either or both counts, of murder in the first degree, murder in the second degree, manslaughter, not guilty by reason of insanity, or not guilty. The court by its instructions defined terms used. It instructed the jury that: "To constitute murder in the first degree under this first count there must have been an unlawful killing, done purposely and with deliberate and premeditated malice."

The court then instructed the jury that it should first determine whether or not defendant killed Jensen in Lancaster County on or about January 27, 1958. If it found that he did, it should then consider whether defendant was not insane at the time of the killing: "If you are not satisfied beyond a reasonable doubt that the defendant was then not insane, or, in other words, if you have a reasonable doubt as to whether the defendant possessed the necessary mental capacity, as hereafter explained, then your verdict must be not guilty by reason of insanity, * * *. If, however, you are satisfied by the evidence beyond a reasonable doubt of the truth of all four of the above material elements, you will then proceed to determine whether the defendant is guilty of murder in the first degree."

The court then again instructed that the material element of murder in the first degree was that the defendant killed Jensen "purposely and of his deliberate and premeditated malice. * * * If, however, the evidence does not satisfy you beyond a reasonable doubt of the truth of the above material element of this count, then your verdict as to this count should be not guilty."

As it indicated it would do "hereafter" in the instructions, the court then instructed the jury that: "* * * a person may be suffering from some form of insanity or impairment of the mind, yet if he has the mental capacity to understand what he is doing and to know it is wrong and deserves punishment, he is criminally responsible for his acts. In this case if, from all of the evidence, you are convinced beyond a reasonable doubt

that the defendant committed the crime charged, or one of the lesser degrees, and at the time of the commission of such crime was of sufficient mental capacity to understand what he was doing, and was of such mental capacity as to know that such act was wrong and deserved punishment, the defendant would be legally responsible for his acts and you should return a verdict of guilty although you might find that at the time he was suffering from some insanity or impairment of the mind."

The defendant makes no contention of error in the above instructions. It is patent that the trial court related the subject of mental capacity to the element of deliberation and premeditation. No other rational construction can be placed on the ordered sequence of the instructions in that regard.

The established rule is: "It is not error to refuse instructions requested by defendant where the court on its own motion has given the substance of such requests. The trial court is not required to instruct in the exact language of a requested instruction. If the point is covered by an instruction couched in proper terms, it meets all the requirements of the law." Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632.

The trial court did not err in refusing to give the requested instruction.

We have included herein quotations of only a part of the trial court's instructions as to mental capacity. With one exception the instructions are not assigned as error.

Within the instruction and near its close, the trial court included this sentence: "In this respect, feebleness of the mind or will, if such you find, even though not so extreme as to justify your finding that the defendant is irresponsible, may nevertheless be properly considered by you in determining whether a homicide has been committed with a deliberate and premeditated design to kill where the grade of the offense requires those lements (sic)."

Defendant's complaint by way of argument is directed largely at the inclusion of the above last-quoted language. It is contended that it refers to only "one factor of deliberation and premeditation for the purpose of determining the degree of the offense, and not whether one has been committed."

Defendant contends that the trial court by this language excluded from the consideration of the jury all evidence of the mental condition of the defendant, except that which could be classified as "feebleness of the mind or will" in determining whether there was present a deliberate and premeditated design to kill.

We do not so read the instruction. There was evidence offered which the defendant claimed went directly to the question of feebleness of the mind or will of the defendant. Specifically the court directed the jury's attention to that evidence and by the use of the phrase "In this respect" tied that evidence into the general evidence of mental capacity that could be considered by the jury to determine whether the offense had been committed with "a deliberate and premeditated design to kill." By so doing the trial court included the evidence of feebleness of mind or will in the evidence on the broad issue of deliberate and premeditated design to kill. It had done so earlier in defining the crime of murder in the first degree. It was done here a second time. The trial court did not restrict the issue of criminal responsibility to the evidence of feebleness of mind or will.

The defendant requested the court to give this instruction: "Feebleness of mind or will, even though not so extreme as to justify a finding that the defendant is irresponsible, may nevertheless be properly considered by you in determining whether a homicide has been committed with a deliberate and premeditated design to kill, and may thus be effective to reduce the grade of the offense." This obviously rests upon our holding in Washington v. State, 165 Neb. 275, 85 N. W. 2d 509.

It will be noted that the court gave the substance of this requested instruction as above set out.

The rule is: "Ordinarily, error cannot be predicated on an instruction given at the request of the complaining party. Bell v. State, 114 Neb. 17." Torske v. State, 123 Neb. 161, 242 N. W. 408.

We find no merit in the error assigned and above discussed.

The defendant requested the court to instruct the jury as follows: "A felonious intent to steal the same is an essential ingredient of the crime of robbery and if you find that the defendant did not have the mental capacity for forming and entertaining such a felonious intent at the time of the alleged perpetration of a robbery as charged in Count II, you are to find him not guilty of that crime as charged." The court refused the request. Defendant assigns it as error.

The court in defining robbery included in the definition the clause "with the intent to rob or steal." In its instruction as to count II the court included "intent to rob" as an element to be proven.

Further the court instructed the jury that one of the essential elements of the crime charged in count II was "the intent to rob or steal." The court instructed that the jury must also consider the material element to the State's case that the defendant "was not insane." The court set out, as hereinbefore stated, the requirements placed upon the State to prove the sanity of the defendant. The court further stated that "intent" was a necessary element to prove the crime charged against the defendant and instructed as to how that could be determined.

The assignment is predicated on the proposition that the forming and entertaining of a criminal intent is a question for the jury's consideration in determining whether the accused is guilty of the crime charged.

It appears obvious that the question was submitted

to the jury by instructions with which defendant finds no fault.

The established rule is quoted above from Grandsinger v. State, *supra.*

The assignment is not sustained.

The theory of the defendant, as stated in the assignment of error, seems to be that we can reduce the sentence from death to life imprisonment based on the claimed weakness of the evidence as to deliberation and premeditation. Either the evidence is sufficient to sustain the verdict and judgment, or it is insufficient. As stated above we have considered the evidence that went to the jury and deem it quite sufficient to sustain the verdict. When once guilt of murder in the first degree is determined the primary duty to fix the penalty rests upon the jury. See, § 28-401, R. R. S. 1943; Sundahl v. State, 154 Neb. 550, 48 N. W. 2d 689. It is a duty of the jury separate and apart and subsequent to the determination of guilt of murder in the first degree.

We discussed section 29-2308, R. R. S. 1943, in Sundahl v. State, *supra.* We see no reason to repeat here the conclusions there reached. They are in principle applicable here.

We have examined the entire cause and consider that no substantial miscarriage of justice has actually occurred.

The judgment of the trial court is affirmed.

Friday, the 27th day of March 1959, between the hours of 6 a.m. and 6 p.m. of said day is fixed as the date for carrying into effect the sentence of the district court.

AFFIRMED.

WENKE, J., participating on briefs.