STATE OF NEBRASKA, APPELLEE, v. THOMAS A. ALVAREZ, APPELLANT.

154 N. W. 2d 746

Filed December 8, 1967. No. 36637.

T. Clement Gaughan and Richard L. Goos, for appellant.

Clarence A. H. Meyer, Attorney General, and Richard H. Williams, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

CARTER, J.

This is an appeal from the assessment of the death penalty in a first degree murder conviction after a plea of guilty.

The defendant was a young, single man of Mexican origin of the age of 19 years. He was a strong, ablebodied man, very interested in sports with a special interest in boxing. On September 14, 1966, he was employed by Lincoln Landscaping, Ltd., and was assigned to the doing of yardwork at the Rohman home immediately north of the home of Mary O'Shea, the victim of the murder. The record shows that the defendant entered the O'Shea home, physically assaulted Mrs. O'Shea, raped her while she was in an unconscious condition, and, when she showed signs of regaining consciousness, strangled her with a cord which he cut from a window drape, took some valuable rings from her finger, left the scene, and was arrested by the police while on his way to the bus station to take a bus to Denver, Colorado.

The defendant states in his confession that he was trimming trees in the Rohman yard when Mrs. O'Shea returned from transporting one of her children to school after the noon hour. He says that she invited him into the house for a cup of coffee and began to visit with him about his girl friends. Without any provocation on his part, he says, she began screaming "rape" and threatened to call the police. He struck her several times, reduced her to a state of unconsciousness, removed her clothing,

raped her, and strangled her to death as previously related. The evidence further shows that John O'Shea, age 5, and a little girl, Abbie Druliner, accompanied Mrs. O'Shea when she took her older son to school and returned with her. John stated that when the three of them entered the home, the defendant was hiding near the refrigerator and he jumped out, grabbed his mother, began choking her, and knocked her to the floor. In view of the subsequent events, the statements of the defendant that Mrs. O'Shea brought sex into the conversation and made advances into this area is wholly unworthy of belief. This conclusion is supported by statements in the report of Dr. Charles A. Rymer, a psychiatrist, which were given him by the defendant, as follows: He has had sexual relations with many girls continuously since age 13, he is the father of a 3-month-old son, presently has two girls pregnant in Denver, Colorado, and has been recently suspected of murdering a young girl working as a babysitter in Denver and released for lack of proof. We have been unable to find any mitigating circumstances for the murder in the facts establishing the murder itself.

The main contentions of the defendant in support of a reduction of his sentence of death to life imprisonment are the poor environment in which he was raised and an assertion of psychiatric condition resulting in a decompensation of his mental faculties.

The record shows that the defendant was an illegitimate child. His mother has been married three times and the defendant was unable to get along with any of his stepfathers, and lived with his maternal grandmother in his early youth. He attended school until the middle of the 12th grade when he dropped out of school. In some subjects he did quite well; in most he was a poor student. His school records show on one report that he missed 30 days of school. He was a mild mannered young man most of the time, but at times was not. He seems to have developed a tendency to engage in fight-

ing with little or no provocation. He was arrested many times for minor offenses. He resented any form of discipline, and restrictions imposed on him, by law or otherwise, were an anathema to him. Out of this grew a belief by some that he was abnormal and was a fit subject for psychiatric treatment. Several psychiatric physicians have examined him since the murder on September 14, 1966, with varying results. There is evidence submitted that while he was serving in the Navy before the murder, his conduct was such that he was subject to psychiatric examination. There is evidence in the record that he attempted suicide on three occasions. These matters were all considered in evaluating his psychiatric condition. A brief review of these evaluations seems necessary.

In March 1966, defendant was given a psychiatric evaluation by a United States Navy physician, the report of which contains the following: "Emotionally Unstable Personality with strong antisocial tendencies as manifested by fluctuating moods, suicidal gestures to get out of an undesirable situation, inability to tolerate restrictions, inability to postpone gratification of immediate desires and apparent inability to profit from experience or punishment. * * * There is no indication for psychiatric treatment or hospitalization. It is also noted that he is fully responsible for all his actions and that any future acting out should be considered a misconduct and treated as such." David Levine, Ph.D., Professor of Psychology, evaluated the defendant and stated in part in his report: "On the basis of this evaluation, it is my judgment that he is mentally competent to assist in his defense and that he understood the nature and consequences of his behavior at the time of the crime. * * * He is not mentally retarded and there are no signs or organic brain damage. * * * My own approach to these scores on the MMPI [Minnesota Multiphasic Personality Inventory] (that is, a very high Schizophrenic Score and a very high faking score) is to look at other tests for cor-

roborating evidence. I gave Alvarez the Rorschach, the Sentence Completion, and the Wechsler Bellevue, Form II, and could find no evidence which would lead me to consider his high schizophrenic score on the MMPI valid. The most reasonable conclusion is that he was faking on this test. His responses to the Rorschach were quick (a reflection of his impulsivity, I believe), but they were realistic, conventional, and almost stereotyped." Dr. Charles A. Rymer, a psychiatric physician, evaluated the defendant's mentality. In his report, he says in part: "The mental examination reveals no deviation which might be considered as representing any type of psychosis. His intellectual rating is that of a dull normal. As to the details of his crime it would be my impression that he is well aware of the fact that he did kill his victim and that he did rape her. The story as related by him appears to be logical and coherent, although the details may vary in some degree. As a result of this examination it is my opinion that Mr. Alvarez is mentally competent, that he knows the difference between right and wrong, and he knows that he committed a murder. It is my opinion, based upon the history, that he has been accountable in the past for his behavior and was accountable for his behavior on September 14, 1966."

The defendant was examined on behalf of the defendant by Nathan Greenbaum, Ph.D., and Dr. Stanton L. Rosenberg, psychiatrist, who filed a joint report of their evaluation of the defendant. We summarize their report by quoting the following from it: "Indeed, we can understand this entire episode as a form of temporary insanity, during which he was not in command of his mental faculties, did not and could not know the nature of the act, and was not capable of knowing that what he was doing was wrong. As indicated in our preliminary report of December 2, 1966, while he is capable in retrospect of acknowledging the wrongness of his act and the concomitant remorse, he was not capable at the time of commission of the act, by virtue of his temporary insan-

ity, to determine right versus wrong or to act in consonance with any such knowledge of right versus wrong." The report shows that the history affording the basis for its conclusion was obtained from the defendant, his mother, and previous records. The statement of facts contains much that does not appear in any of the statements given to other psychologists and psychiatrists. It is odd, indeed, that much of the historical evidence was not revealed to other psychiatrists who examined the defendant. It is apparent that defendant, at the time of this examination, was able to recall more self-serving facts as to his mental condition previous to the murder than he had been able to do at previous psychiatric examinations.

We here call attention to the fact that the defendant entered his plea of guilty after consulting with his legal counsel. There was no trial. After the acceptance of the plea, the sentencing of the defendant was delayed until a thorough presentence investigation could be made. Police investigation reports, statements, confessions, character references, and reports of psychiatrists and psychologists were accumulated and submitted to the trial court. Opportunity to cross-examine witnesses or to comment on the contents of the presentence investigation was neither required nor afforded. The sentencing court evidently examined the 198-page report and available exhibits and came to the conclusion that the case was one calling for the assessment of the death penalty. A careful review of this lengthy investigation report does not indicate that the trial court failed to exercise the responsibility lodged in it by section 28-401, R. R. S. 1943.

The defendant asks this court to reduce the sentence from death to life imprisonment under the authority of section 29-2308, R. R. S. 1943, which provides in part: "In all criminal cases that now are, or may hereafter be pending in the Supreme Court on error, the court may reduce the sentence rendered by the district court against the accused, when in its opinion the sentence is excessive,

and it shall be the duty of the Supreme Court to render such sentence against the accused as in its opinion may be warranted by the evidence." We point out that this statute does not authorize this court to reduce criminal sentences as a matter of grace, but, on the contrary, such sentences may be reduced only when they are found to be excessive. The issue is a judicial one and not one that may be exercised at will.

It is first contended the defendant, in entering a plea of guilty, saved a trial and the costs thereof, and that he is entitled to some compensation in the form of mitigation of punishment. That a plea of guilty sometimes warrants a reduction of the degree of a crime or the term of the sentence to be imposed is undoubtedly true. But a court is not bound to mitigate the punishment when the circumstances do not justify it. If such a mandatory rule existed, every person guilty of crime could avoid the maximum penalty by simply pleading guilty. The motivation for the guilty plea in this case is not known to us. We hazard a guess that defendant reasoned that he had a better chance for a life sentence with the court by pleading guilty than he would have after a verdict of guilty by a jury. But in any event, the trial court may or may not give consideration to a guilty plea, dependent on the circumstances of the case. Defendant contends that he cooperated fully with the police. This appears to be true after he found out they had evidence of his guilt. Before that, however, he denied the crime or any connection with it. Here again the trial court may consider the fact of cooperation with law enforcement officers, but it is not bound to do so. It is also urged that the trial court abused its discretion in sentencing the defendant to death when such penalty was not demanded by the prosecution. There may be many reasons or none at all why the prosecuting attorney does not demand the death penalty. The sentence rests with the trial court and the failure of the prosecutor to demand the death penalty in no manner limits the

responsibility of the trial court to fix the sentence in accordance with the law and the evidence.

Defendant contends that his emotional and mental instability, as shown by the presentence investigation, requires a reduction of the sentence to life imprisonment. We point out that the commission of every crime of the nature here shown indicates a degree of abnormality. The commission of a brutal killing, without provocation, of a woman unknown to the defendant necessarily shows some emotional instability. The differentiation of this type of mental decompensation with that indicating mental irresponsibility for crime involves a close examination of the facts. The viciousness of the crime is enough for some to establish sufficient mental instability to justify a reduction of sentence. But the very viciousness and brutality of the crime does not of itself give rise to judicial leniency.

There is much said about three alleged suicidal attempts, but they do not indicate serious attempts by the defendant to take his own life. They do indicate that they were "suicidal gestures to get out of an undesirable situation," as found by at least one of the examining psychiatrists. It is argued that the fact that multiple killings were not involved is a matter for consideration and the cases of Starkweather v. State, 167 Neb. 477, 93 N. W. 2d 619, and Sherman v. State, 118 Neb. 84, 223 N. W. 645, are noteworthy examples. But the imposition of the death sentence is not applicable only to multiple killings. Such a sentence may be imposed in a single killing where the crime was so gruesome and vicious, and the defendant so depraved in character as to authorize a death sentence. The case is controlled by Sundahl v. State, 154 Neb. 550, 48 N. W. 2d 689, and MacAvoy v. State, 144 Neb. 827, 15 N. W. 2d 45, 323 U. S. 804, 65 S. Ct. 559, 89 L. Ed. 642. In the last-cited case, we said: "The crime here committed is so gruesome and depraved in character that a reduction of the sentence prescribed by the jury and imposed

by the trial court would amount to a holding that capital punishment will never be enforced in this state, irrespective of the legislative enactments on the subject." The quotation has application to the case before us.

It is argued here that the death penalty is a relic of an uncivilized past, that it is now, in our modern society, a cruel and unusual punishment, that it has no deterrent effect, that public opinion is opposed to it, and that the death penalty is not necessary. These contentions will be briefly commented upon. The death penalty by electrocution as punishment for crime is not a cruel and unusual punishment within the meaning of the state and federal Constitutions. In re Kemmler, 136 U. S. 436, 10 S. Ct. 930, 34 L. Ed. 519; Malloy v. South Carolina, 237 U. S. 180, 35 S. Ct. 507, 59 L. Ed. 905. That such punishment is the relic of an uncivilized past is purely a matter of opinion. The assertion that capital punishment has no deterrent effect is an unsupported claim. No one can know the extent of the deterrent effect of such punishment. In any event, the fixing of the minimum and maximum punishment for crime is a legislative function with which this court is powerless to interfere. This court has attempted over the years to maintain a consistent application of the act. The repugnance, that some individuals may feel toward capital punishment must be put aside in obedience to the law of the state. The views of the public as shown by statistics purporting to support them are of no avail in the determination of questions of law. It is urged here that it is not necessary to impose the death penalty in the instant case. The trial court determined that it was and this court finds adequate support for that finding in the evidence. The legislative act providing for the death penalty clearly indicates that the death penalty was to be imposed in certain cases, otherwise such penalty would not have been provided for in the statute. The interpretations of the statute by this court sustain the judgment

of the trial court. The decision of the trial court involves a most serious responsibility and a great deal of soul-searching. The trial judge, in imposing the death sentence, as being required by the law of this state, evidences the integrity in the enforcement of the law that his oath of office imposed upon him. We are unable to find any reason for interfering with the judgment of the trial court under the evidence presented.

The judgment of the district court is in all respects affirmed and Friday, March 22, 1968, between the hours of 6 o'clock a.m., and 6 o'clock p.m., of said day, is fixed as the date for carrying into effect the sentence of the district court.

AFFIRMED.